**DISTRICT 50, UNITED MINE WORKERS OF AMERICA, LOCAL 13942,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

Allied Chemical Corporation, Intervener.

No. 10056.

United States Court of Appeals Fourth Circuit.

Argued Dec. 8, 1965.

Decided March 14, 1966.

Beecher E. Stallard and Alexander B. McMurtrie, Richmond, Va., for petitioner.

Solomon I. Hirsh, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Linda R. Sher, Atty., National Labor Relations Board, on brief), for respondent.

John H. Morse, New York City (Melvyn Freeman, and Cravath, Swaine & Moore, New York City, on brief), for intervener.

Before SOBELOFF and BRYAN, Circuit Judges, and MAXWELL, District Judge.

SOBELOFF, Circuit Judge.

This is a union's petition to set aside a Board order which reversed the trial examiner and cleared the Allied Chemical Corporation of charges that it had violated section 8(a) (5) and (1) of the National Labor Relations Act by refusing to notify and bargain with the union respecting certain subcontracting decisions.

The company began operations at its Bermuda Hundred, Virginia, plant in 1955, and since then has recognized and bargained with District 50 as the representative of its production and maintenance employees.

The maintenance department has grown from three employees in 1954 to 244 employees in 1963. The company engages in maintenance and repair work of three types: 1) routine and preventive maintenance—which is always performed by the company's employees; 2) major construction, such as painting high water towers and specialized electrical work—which is always performed by outside contractors; and 3) scheduled repairs, such as machine improvement and minor construction—which is performed both by company employees and outside contractors. Personnel of the company and of outside contractors have worked side by side on scheduled repairs; and

company employees have sometimes started jobs that were completed by outside contractors, and vice-versa. The third mentioned category of maintenance and repair work is the subject of the controversy.

In August, 1963, two months after the latest collective bargaining agreement was signed, the union requested the employer to notify and bargain with it respecting the company's decisions to subcontract this third type of maintenance work.[1] The company replied that it would answer questions about subcontracts after they were let but would not notify the union beforehand. Thereupon the union filed charges with the National Labor Relations Board.

Concededly, no employees in the maintenance department have been laid off or discharged as a result of the company's unilateral decisions. It is also undisputed that some employees in that department have performed so much overtime work that they have refused additional overtime assignments. However, the company insists on making its subcontracting decisions without first consulting the employees as to whether they want overtime work, and Maintenance Superintendent Robert Colmer admitted that in the past some employees may have lost overtime because of the subcontracts. Employees fear future loss of overtime, and ultimately loss of jobs as well. This fear, generated by the employer's refusal to disclose its intentions before taking action, is the nub of the issue.

■ In determining whether the employer has violated its duty to bargain about "wages, hours and other terms and conditions of employment," the Board and the courts must examine the impact of the employer's unilateral decisions on the employee unit involved. The Board noted, and the union concedes that since the establishment of the Bermuda Hundred plant in 1955, the company's practice has been to make a choice, without prior consultation with the union, between assigning this type of work to its own employees and contracting it out. The National Labor Relations Board argues that under Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), and subsequent Board decisions the employer's duty to bargain over a decision to subcontract arises only where the employer purposes to take action which will effect some *change* in *existing* employment terms or conditions which adversely affects the employee unit. Westinghouse Electric Corp. (Mansfield Plant), 150 N.L.R.B. No. 136, 58 L.R.R.M. 1257 (1965).[2] The Board concluded in this case that there was no evidence of a *significant* impact on the employees from which it could find that the employer, by unilaterally deciding to subcontract, violated its duty to bargain.

The union contended, and the trial examiner found, that there was a substantial increase in the amount of subcontracting after the execution of the most recent collective bargaining agreement, on June 14, 1963, and that, therefore, the impact on the employees of the company's unilateral decisions to subcontract has been more significant than in the past. This finding of the Examiner the Board refused to accept because it was based on

---

1. During the negotiations which led to the execution of the collective agreement, the union attempted to secure a commitment from the employer which would have restricted the company's right unilaterally to subcontract this type of work. After the parties fully discussed the issue, the union agreed to a contract which did not contain the desired restriction.

2. See Westinghouse Electric Corp. (Bettis Laboratory), 153 N.L.R.B. No. 33, 59 L.R.R.M. 1355 (1965); American Oil Co., 152 N.L.R.B. No. 7, 59 L.R.R.M. 1007 (1965); Central Soya Co., 151 N.L.R.B. No. 161, 58 L.R.R.M. 1667 (1965); American Oil Co., 151 N.L.R.B. No. 45, 58 L.R.R.M. 1412 (1965); Fafnir Bearing Co., 151 N.L.R.B. No. 40, 58 L.R.R.M. 1397 (1965); Shell Oil Co., 149 N.L.R.B. No. 22, 57 L.R.R.M. 1271 (1964); Kennecott Copper Corp., 148 N.L.R.B. No. 169, 57 L.R.R.M. 1217 (1964). Cf. NLRB v. Adams Dairy, Inc., 350 F.2d 108 (8th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed. 2d 526 (Jan. 24, 1966).

the testimony of Union Representative Fohl, who, admittedly had little, if any, direct knowledge of the extent of subcontracting before or after the date of execution of the agreement. Rather, the Board said, Fohl's conclusion was based on complaints of an unidentified employee or employees. The Board, treating Fohl's testimony as no more than a hearsay account of a general conclusion on the part of an employee or employees, declared that it was not entitled to the weight attached to it by the trial examiner, who apparently attributed the lack of precise information to the company's own failure to produce evidence to rebut Fohl's testimony.[3]

■ From our review of the record we think the Board was entitled to conclude that there was no substantial adverse impact on the employees caused by the employer's subcontracting decisions. We therefore affirm.

To our affirmance, however, it seems appropriate to add some observations concerning the questions raised by an employer's decisions to subcontract. Determining what is a "substantial" adverse impact on the bargaining unit presents a most difficult problem. In *Fibreboard*, employees were discharged as a result of a unilateral decision to subcontract all the company's maintenance work. In the case before us there have been no actual discharges, but the company conceded that in the past its contracting out resulted in some employees suffering a reduction in overtime work opportunities and, even more to the point, the company's policy of secrecy about its subcontracting practices did unquestionably in the months after the June 1963 agreement generate a sense of insecurity among the employees.

The company's position, upheld by the Board, is that where there has been no

proven adverse impact on the existing working conditions, the employer's unilateral decision to subcontract is not a violation of the Act. With equal vigor the union maintains that despite the existence of a collective bargaining agreement the employer should bargain about every decision to subcontract because it may affect the employees' work opportunities.

One can appreciate the fears of the employees arising from the unilateral procedures of the employer. Even though no one has been discharged, or proved loss of overtime during the months in question, the fears are palpably real and disturbing.[4] The fact that the employees' apprehensions could in the future prove unfounded does not alleviate their present concern. Moreover, if the fears should turn out to be well founded, protracted litigation and a remedy attained after months or years of delay is rarely a satisfactory solution from the employees' standpoint and is not without cost and hazard to the employer. From the public standpoint, too, a labor relations procedure which needlessly promotes suspicion and misunderstanding is hardly consonant with the underlying philosophy of the National Labor Relations Act.

■ But just as we indicate our understanding of the employees' fears, the employer's position must also be considered. Where a company, during the life of a collective bargaining agreement, finds it economically desirable in the normal course of business to subcontract certain work, it may be exceedingly impractical to compel costly and sometimes frustrating negotiations at the collective bargaining table to the point of impasse, as is the practice in the initial negotiation of a collective bargaining agreement. If bargaining in the conventional sense were required, as the union contends, the

3. Maintenance Superintendent Colmer testified that he attempted to keep the "status quo" regarding the relationship of the amount of maintenance work subcontracted to that done by the company's own employees. The Board's decision, however, makes no mention of this testimony.

4. Moreover, the insecurity might be present, due to the company's refusal to supply information, irrespective of whether the company was merely continuing past practices or was departing from those practices and instituting new ones.

employer might be obligated to attend numerous meetings with the union to discuss offers and counteroffers, to furnish pertinent financial data upon which it bases its proposed decision, to haggle with the union over the proper interpretation of the financial sheets [5]—and it would have to bargain to an "impasse." In this view, then and only then would the employer be free to implement its decision.[6] Full-scale collective bargaining in this context seems indeed burdensome and inappropriate, although admittedly a duty to bargain in good faith continues during the life of the agreement. See American Oil Co., 151 N.L.R.B. No. 45, 58 L.R.R.M. 1412, 1413 (1965).

It would be an invaluable service to management and labor to develop appropriate procedures to deal with subcontracting issues arising from time to time during the life of a collective bargaining agreement. Negotiations of this type should not be the same as bargaining for a contract. They need not be as formal or extensive, but some form of negotiation is likely to be needed in the interest of industrial peace during the life of the agreement. This the Board seems to have perceived in its opinion in Shell Oil Co., 149 N.L.R.B. No. 26, 57 L.R.R.M. 1279, 1280 (1964):

> " * * * [W]e are mindful that the permissibility of unilateral subcontracting will be determined by a consideration of the setting of each case. Thus, the amount of time and discussion required to satisfy the statutory obligation 'to meet at reasonable times and confer in good faith' may vary with the character of the subcontracting, the impact on employees, and the exigencies of the particular business situation involved."

■ Situations may and often do arise during the life of a collective bargaining contract in which the duty to "bargain in good faith" may be satisfied by something less than full-scale bargaining. An employer may be obliged under the compulsion of some circumstances to make subcontracting decisions without delay. Emergencies could arise that require immediate action. The employer's prerogative in this class of cases should be respected without requiring prior bargaining or even notification of the union. However, other contracting decisions may not demand immediate action, and respecting these types of decisions, there may be no practical obstacle to notification of the union, and to affording it an opportunity to be heard.

By notification and discussion, however, we mean an alternative in appropriate cases to full-scale collective bargaining. The union should not be permitted to stall the company's decision by insistence on protracted negotiations. The company should be permitted, after listening to the union's suggestions, to accept or reject them as its economic judgment dictates. But this does not mean that ordinarily the employer should act without giving notice and an opportunity for exchange of ideas.

■ We have above stated our agreement with the Board's holding that in this case the record fails to disclose any substantial loss of overtime work which might create a significant adverse impact on the employees. We add, however, that were the impact substantial, the full-scale bargaining contended for by the union would not necessarily be appropriate. There is a difference between a decision to close a department with consequent layoffs, and decisions to subcontract which may result in less serious deprivations. It is a matter of degree and the statutory bargaining requirements should be flexibly administered to meet the needs of the particular case. The Board's approach in

---

5. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); NLRB v. Western Wirebound Box Co., 356 F.2d 88 (9th Cir. January 19, 1966).

6. See NLRB v. Katz, 369 U.S. 736, 82 S. Ct. 1107, 8 L.Ed.2d 230 (1962).

the *Shell Oil* case, supra, seems to point a way toward a balanced and economically feasible accommodation between the interests of the parties in respect to decisions to subcontract.[7]

Petition denied.

Timbers, District Judge, concurred in part and dissented in part.

---

7. For not dissimilar views, see "The Development of the *Fibreboard* Doctrine: The Duty to Bargain Over Economically Motivated Subcontracting Decisions," 33 U.Chi.L.Rev. 315 (1966); Cf. Shawe, "An Employer's Duty to Bargain Over a Decision to Subcontract," 1 Harv. Legal Commentary 218 (1964).