**WESTINGHOUSE ELECTRIC CORPO-
RATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 10545.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 5, 1966.

Decided Nov. 23, 1966.

John G. Wayman, Pittsburgh, Pa., (Leonard L. Scheinholtz, Paul A. Manion and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on brief), for petitioner.

Glen M. Bendixsen, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Michael N. Sohn, Atty., N. L. R. B., on brief), for respondent.

Benjamin Werne and William Roth, New York City, on brief for National Automatic Merchandising Ass'n, as amicus curiae.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

Westinghouse Electric Corporation petitions this court to review and set aside an order of the National Labor Relations Board directing that Westinghouse bargain with the Salaried Employees Association of the Baltimore Division, Federation of Westinghouse Independent Salaried Unions (hereinafter referred to as the Association) in respect to changes in food prices at cafeterias in plants comprising the employer's Defense Center near Friendship Airport, about eight miles from the center of Baltimore.[1] The Board cross-petitions for enforcement of its order.

In response to the announcement of an increase in food prices, the Association, exclusive bargaining representative for appropriate units within the Defense Center, requested in October 1964 a meeting with Westinghouse to discuss cafeteria conditions. A meeting was arranged in the office of the Westinghouse industrial relations representative with executives of the Baltimore Catering Company, operator of the cafeterias under contract from Westinghouse.[2] A representative of Westinghouse was present. He considered his status that of an observer.

Westinghouse adopted the position that the Association would have to discuss food prices exclusively with the caterer, since as an independent contractor it controlled cafeteria prices. Hence, Westinghouse maintained it had no obligation to

---

1. The decision and order of the Labor Board are reported at 61 L.R.R.M. 1165 (January 21, 1966).

2. Set out below are relevant provisions from the renewable one-year contract between Westinghouse and the Baltimore Catering Company (CONTRACTOR):

   "2. (E)ither party shall have the right at any time to terminate this agreement upon sixty (60) days written notice to the other party.

   "3. WESTINGHOUSE shall provide for the use of CONTRACTOR, cafeterias equipped in a manner satisfactory to WESTINGHOUSE, which shall in their entirety remain the property of WESTINGHOUSE at the premises above mentioned.

   *  *  *  *  *  *

   "6. CONTRACTOR shall, at his own expense, maintain in good order, and shall at his own expense replace, in the event of loss * * * all dishes, glassware, silverware and cooking utensils in the cafeterias.

   "7. WESTINGHOUSE shall maintain the capital equipment which it provides for the use of the CONTRACTOR * * *.

   "8. CONTRACTOR shall furnish sufficient personnel to properly operate the cafeterias * * * and shall provide all meals and food-stuffs of good quality and quantity, *subject at all times to the approval of the Manager of Westinghouse* at the premises above mentioned.

   "9. *The quality and prices* of the meals served, and hours of service thereof, in said cafeterias *shall at all times be reasonable.*

   *  *  *  *  *  *

   "19. As compensation for the privileges hereinbefore granted, CONTRACTOR shall pay to WESTINGHOUSE the sum of one dollar ($1.00) per year in advance, thoughout the term of this agreement * * *. CONTRACTOR shall maintain accounting records to WESTINGHOUSE which shall be subject to periodical audit at the discretion of WESTINGHOUSE, and daily deposit slips in duplicate shall be furnished each day to WESTINGHOUSE. A monthly record of all sales shall be submitted to WESTINGHOUSE on or before the 10th day of each month covering the preceding calendar month." (Emphasis added.)

bargain in respect to the food prices and refused to negotiate the matter with representatives of the Association.

Subsequently, in January 1965, the caterer posted notice of an additional increase of five cents in the price of hot food entrees and of one cent in the price of carry-out coffee. Westinghouse, upon request of the Association to negotiate in regard to these increases, refused again for the stated reason that it had no control over cafeteria prices set by the caterer, an independent contractor.

The unwillingness of Westinghouse to bargain resulted in the filing of an unfair labor practice charge by the Association. A complaint was issued, and after a hearing, a decision was rendered by the Trial Examiner. He found that the Westinghouse eating facilities, including the prices of meals served, constitute a condition of employment within the meaning of Section 9(a) of the National Labor Relations Act;[3] that Westinghouse retains a substantial measure of control over the cafeteria prices; and that by its refusal to bargain with the Association in respect to the increase in prices Westinghouse is engaging in unfair labor practices proscribed by Sections 8(a) (1) and (5) of the Labor Act.[4]

The Trial Examiner's recommended order would have required Westinghouse to consult with the Association concerning proposed changes in prices by the catering company before making determinations concerning their reasonableness.

The Labor Board, in January 1966, adopted the findings, conclusions, and recommendations of the Trial Examiner with some modifications. Two of the five Board members filed a vigorous dissent.

The majority of the Board agreed that the disputed matter was a mandatory subject of bargaining and that Westinghouse had committed 8(a) (1) and (5) unfair labor practices by refusing to negotiate after request by the Association. The recommended order was found, however, to be too broad and accordingly was revised to permit Westinghouse to unilaterally consult with the caterer concerning proposed price changes and approve them without notice or discussion with the Association. Even so, the Labor Board majority required that Westinghouse honor "a specific request for bargaining about changes made or to be made."

The question presented by the present petition is a narrow one: whether the prices of food and beverage served in cafeterias at the Westinghouse Defense Center by an independent caterer are the subject of mandatory bargaining. The initial inquiry for the court is whether the cafeteria prices come within the statutory phrase "conditions of employment" as to which Congress has compelled bargaining.

---

3. Section 9(a) of the National Labor Relations Act provides in pertinent part that:
   "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or *other conditions of employment* * * *." 29 U.S.C.A. § 159. (Emphasis added.)

4. Section 8(a) (1) of the National Labor Relations Act provides that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" them in Section 7 of the Act. 29 U.S.C.A. § 158(a) (1). These include the right "to bargain collectively through representatives of their own choosing * * *." 29 U.S.C.A. § 157. Section 8(a) (5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * *." 29 U.S.C.A. § 158(a) (5). Collective bargaining is defined in Section 8(d) as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and *other terms and conditions of employment* * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C.A. § 158(d). (Emphasis added.)

Mr. Justice Stewart, concurring in Fibreboard Paper Products Corp. v. N. L. R. B., states that "[i]n common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment." Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 222, 85 S.Ct. 398, 409, 13 L.Ed.2d 233, 245 (1964) (Stewart J., concurring). The availability of food and drink at reasonable prices seems to us an obviously important part of one's physical working environment. What, including the air one breathes, could be more "physical"? Why would a company provide its employees a cafeteria on its premises, effectively subsidized,[5] except for its concern and interest in their physical working environment?

Insistence by Westinghouse that on-site cafeteria conditions are not a subject of mandatory collective bargaining is especially without merit in the present circumstances. The record shows that Westinghouse employees are allowed from thirty to forty-five minutes for lunch and that only inadequate independent eating facilities exist within a reasonable distance of the plants.[6] Some forty to forty-five percent of Westinghouse employees eat in the plant cafeterias. Those who want hot food are dependent on their employer's cafeterias, although others may prefer to carry lunch pails from home.

The fact that Westinghouse provides the caterer with the space and capital equipment for the nominal rent of one dollar a year and that on at least one occasion it underwrote the caterer's operating loss is strong indication that Westinghouse considers the cafeterias of some significance as a job inducement and as an aid to maintaining employee morale.

Westinghouse seeks to distinguish Weyerhaeuser Timber Co., 87 N. L. R. B. 672 (1949), where the Labor Board held that the employer had a statutory duty to bargain about the price of meals served at its logging camps. It is true that a logging camp is a far cry from metropolitan Baltimore. But the need to eat is the same, and difficulty in doing so may be occasioned by different factors without there being a meaningful distinction between the cases.

Westinghouse has sought to belittle the issue in this case by viewing it solely as a controversy over an increase of a penny a cup on the price of coffee, which it insists could not possibly have any "material effect" on conditions of employment. It argues that this circuit has held that in order to determine whether a particular matter should be a mandatory subject of bargaining within the contemplation of the statute, it must have a "material or significant impact" upon "wages, hours, or other conditions of employment," citing District 50, United Mine Workers v. N. L. R. B., 358 F.2d 234 (4th Cir. 1966), and N. L. R. B. v. Lehigh Portland Cement Co., 205 F.2d 821 (4th Cir. 1953).

---

5. Westinghouse, in effect, subsidizes when it makes space and capital equipment available to the caterer for nominal consideration. Moreover, the record shows that Westinghouse reimbursed the caterer to the extent of $1,800.00 during an earlier period when the cafeteria at one location began operations before employment had reached its peak.

6. The Labor Board found specifically that there were "inadequate dining facilities within a reasonable distance of (the Westinghouse) plants." The Board adopted the findings of the Trial Examiner which included that Westinghouse employees were "compelled" by existing circumstances to eat on the premises because "off-the-premises eating is fraught with so many obstacles as to make it impossible for employees to secure a meal and return within the time allotted to them. * * * (T)he nearest off-the-premises eating facilities are about a mile away, there is, considering the large number of employees at these sites, insufficient seating capacity at the available places, there is a lack of ready access to such places by commercial transportation, and, were private automobiles to be used, there would be the inescapable time factor incident to getting to and from the company parking lots, traversing the public highway and finding parking space and then parking at or near the eating place."

True, *District 50* did contain those words, but they were spoken in a very different context. There the employer had entered into subcontracts for certain maintenance work and the question was whether it should be required to bargain in advance about every decision to subcontract, merely because such practices *might* in the future affect employees' work opportunities. It was shown that the pre-existing subcontracting practice had not resulted in any employee suffering a layoff or loss of overtime. The court agreed that on such a record the Board was entitled to conclude that there was no "substantial" adverse impact on the employees caused by the employer's subcontracting decisions. In the case at bar, however, the dispute is not only over the theoretical possibility of a future price increase, but a price increase that has already been instituted and that affects some forty to forty-five percent of the employees. While in *District 50* we found no substantial impact on the employees requiring the employer to bargain, we observed that even if the impact were substantial, it might be unduly burdensome and impracticable to require full-scale bargaining in advance of every decision to subcontract before it was put into effect. In keeping with this suggestion, the Board has, in this case, limited its order by the express reservation that the employer need not bargain over proposed price increases in advance, but need discuss such price changes only after they are effectuated unilaterally and upon a specific request of the union.

Similarly, in *Lehigh Portland Cement,* supra, we held that company-owned housing is a proper subject of collective bargaining if it "materially affects the conditions of employment." The dispute in that case concerned the employer's refusal to bargain after he had unilaterally raised the rents on company-owned housing. We found that where the rent had been below the prevailing rate, "coupled with the convenience of living nearer to the place of work than the great majority of the employees," conditions of employment were sufficiently affected, despite the fact that only twenty-five percent of the workers occupied such housing, and other living quarters were available to them. We thus found a "material" effect although the number of workers affected was substantially less than is involved in the present dispute.

An increase in the prices charged for food offered in the only facility available to the employees unquestionably has substantial impact on the workers. The small amount of the increases in the price of coffee and hot dishes is not the measure of the importance of the issue. In determining whether a matter is a mandatory subject of bargaining, whether much or little is involved financially is not the controlling test.

Involved here is no issue touching managerial prerogatives which lie at "the core of entrepreneurial control," Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed. 2d 233, 246 (1964) (Stewart, J., concurring), but an employee benefit, encompassed in the Labor Act's requirement to bargain collectively.[7] In discussing "conditions of employment" which are proper subjects of bargaining, the court in Inland Steel Co. v. N. L. R. B., 170 F.2d 247, 251, 12 A.L.R.2d 240 (7th Cir. 1948), named as illustrative "in-plant feeding" as well as such employee benefits as health clinic facilities, vacation periods, and pension plans. The underlying philosophy of the Labor Act is that discussion of issues between labor and management serves as a valuable prophylactic by removing grievances, real or fancied, and tends to improve and stabilize labor relations. Experience teaches that major work interruptions may spring from seemingly trivial causes.

Westinghouse maintains that even should the price charged for food and

---

7. Neither the Association nor the Board has claimed any right for the Association to participate in the selection of a caterer or to participate in forming the contract between employer and caterer.

beverage in a company-operated cafeteria be considered a mandatory subject of bargaining, it ought not to be required to negotiate something over which it has no control. This, Westinghouse insists, would be a mere exercise in futility.

■ The contention of Westinghouse that it exercises no control over prices does not present a question of law but simply one of fact. The Trial Examiner found specifically in his decision, adopted by the Labor Board, that Westinghouse "retains a substantial measure of control over the prices to be charged in the cafeteria." Judicial review of this finding is limited to determining whether it is "supported by substantial evidence on the record considered as·a whole * * *." Section 10(e) and (f) of the National Labor Relations Act, 29 U.S.C.A. § 160 (e), (f), Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed 456 (1951).

■ The record taken as a whole in this controversy supports the conclusion of the Trial Examiner. There is abundant evidence that Westinghouse exercises extensive power over cafeteria policies. This is evident from reservations in the contract [8] and the established practices of Westinghouse and the caterer.

The contract specifies that meals and foodstuffs are to be of good quality, subject to the approval of the Westinghouse manager, and that quality and prices of the meals are at all times to be reasonable. Provision is made for maintenance of accounting records and periodic audits at the discretion of Westinghouse. Daily deposit slips and monthly sales records must be submitted to the company to facilitate audit and determination by Westinghouse of reasonableness of prices.

Moreover, it has been the practice for the caterer to inform and discuss in advance intended price changes with Westinghouse. This would appear necessary to insure against invocation of the sixty-day termination clause, giving either party the right to end the contract after sixty days written notice to the other. The clause accords Westinghouse persuasive economic leverage to influence cafeteria policies.

Westinghouse acknowledges in a letter to its employees,[9] reproduced in the mar-

8. Pertinent provisions of the Westinghouse-Baltimore Catering Company contract are set out in note 2, supra.

9. "WESTINGHOUSE ELECTRIC CORPORATION

"Defense and Space Center

* * *

"October 16, 1964

"Dear Fellow Employee:

"There has been a great deal of misinformation given out about our cafeteria. I would like to tell you what our policy is.

"We are anxious to eliminate eating in the shop and office areas where cleanliness is such an important factor in satisfying our customers. Therefore, we provide cafeteria facilities for the convenience of our employes—whether you bring your lunch or purchase it at the counter. This choice is your own and we have no interest one way or the other whether you buy your lunch or bring it. We provide the facilities but in order to take care of serving beverages and food, we entered into a contract with the Baltimore Catering Company to perform this service. We provide all the facilities and they are responsible for the remainder. *Their operations are monitored by us to be sure that employes get good service, quality food and at prices as reasonable as possible.*

"*We periodically review our cafeteria prices,* and a recent survey shows that they are no higher than other non-subsidized industrial cafeteria prices in the Baltimore area. *In order to monitor the cafeteria prices, we audit the costs for food and labor incurred by the Baltimore Catering Company so that we can have a basis for determining the reasonable of their prices.* These prices, of course, are set with due consideration for food and labor costs and are commensurate for the services rendered. As an example of this, prices in our visitors dining room are set at a higher rate in order to take care of additional service provided for our customers and management.

"*We have always insisted on serving food of the highest quality, at prices as reasonable as possible.* We believe that

gin, that cafeteria operations are monitored by it to insure good service and food at reasonable prices, and that it audits costs in order to have a basis for determining the reasonableness of prices. The company assures its employees it has always "*insisted* on serving food of the highest quality, at prices as reasonable as possible." (Emphasis added.)

Westinghouse urgently insists that the Labor Board's order is impracticable and will not effectuate the purposes of the National Labor Relations Act. We disagree. Westinghouse's position is premised upon the notion, dealt with hereinabove, that it has no control over the caterer and that bargaining about prices would be futile for the reason that no agreement could possibly be reached.

As was said in *Fibreboard*, "[t]he short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation." Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 214, 85 S.Ct. 398, 404, 13 L.Ed.2d 233, 240 (1964).

■ Westinghouse did offer to arrange for meetings between the Association and the caterer. This, however, falls short of the employer's duty under the Labor Act. Westinghouse employees have no statutory relation to the caterer which would require it to bargain with their representatives. It is the employer who is subject to the Act and the Association's recourse is to Westinghouse. The employer cannot be permitted to disperse responsibility by the device of interposing an *alter ego*.

■ Westinghouse suggests that the order of the Labor Board requiring it to negotiate over cafeteria price increases is tantamount to ordering it to cease doing business with the caterer, and amounts therefore to an unfair labor practice under Section 8(e) of the Labor Act.[10] We do not agree. The Association has not asked, nor has the Board ordered Westinghouse to agree to cease business with the caterer. We cannot assume that the exchange of ideas at the bargaining table will produce no alternatives. Nor is it to be assumed that employment of another caterer would necessarily result in lower prices. In any event, a request to negotiate in respect to a condition of employment may not be denied solely because of the remote possibility that the employer may be required to alter his business relationships with other employers.

■ Section 8(e) is inapposite to the present case since it proscribes "hot cargo" and other arrangements intended to affect the labor relation policies of some other employer. See, e. g., Meat and Highway Drivers Union etc. v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709 (1964); Cox, Law and the National Labor Policy 34 (1960); Notes and Comments, 38 N.Y.U.L.Rev. 97 (1963). The agreement sought here is intended only to improve the working conditions of Westinghouse employees.

■ We believe the order of the Labor Board an extremely practical one, well designed to effectuate the purposes of the Act. It is consistent with our view that "statutory bargaining requirements should be flexibly administered to meet the needs of the particular case." District 50, United Mine Workers v. N. L. R. B., supra, 358 F.2d at 238. Bargaining is

---

our cafeteria will stand a test of comparison with any industrial cafeteria in the area.
> "Sincerely,
> "Buford M. Brown,
> Vice President"

(Emphasis added.)

10. "(e) It shall be an unfair labor practice for any labor organization and any

employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees * * * to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void * * *." 29 U.S.C.A. § 158(e).

required, but Westinghouse is still left free to permit the caterer to respond quickly to fluctuation in the cost of food ingredients and the vicissitudes of the restaurant business.

Bargaining, once it begins, may prove to be equally practical. Since Westinghouse and the caterer are left free to initially change prices as they may think necessary, there would seem to be no occasion for full-scale collective bargaining of a formal and extensive nature, which was envisioned as being sometimes burdensome by Judge Soboloff in *District 50,* supra, 358 F.2d at 238. As the Labor Board itself has said, "(t)he amount of time and discussion required to satisfy the statutory obligation 'to meet at reasonable times and confer in good faith' may vary * * *." Shell Oil Co., 149 N. L. R. B. 305, 307 (1964).

The Board's order will be enforced.

BOREMAN, Circuit Judge (dissenting):

Most respectfully I state my disagreement with the majority decision enforcing the Board's order.

Two members of the N. L. R. B. expressed their views in a note of dissent and I find their approach to be most reasonable and fully justified in the circumstances here. The dissenters stated, in part, as follows:

" * * * The statute requires that an employer bargain over wages, hours, and conditions of employment. Here, an employer has voluntarily provided cafeterias for his employees. An independent contractor furnishes the food and sets the prices. Employees may also bring their lunches and eat them in the cafeterias. There is no complusion to buy or to bring lunches; indeed, only 40–45 percent of the work force makes use of the cafeterias. In this case, a union, one of three in the plants, proposes that the prices, including the most recent increase of a penny-a-cup on carryout coffee and 5 cents on hot items, be the subject of mandatory bargaining. Since there is joint, al-though limited use, of the cafeterias, the bargaining over the prices on each item on the menus by each of the three unions has the potential for extensive preemption of management and employee time. * * * The matters of wages, hours, working conditions, job security, and the like are deserving of the status of mandatory collective bargaining; penny-a-cup increases in carryout coffee are better left to the mercies of the voluntary action of the marketplace. When the cash register stops ringing, the price of coffee will begin descending."

In determining whether a particular matter should be deemed a subject of mandatory bargaining there should be a recognition of the legal distinction between those subjects which have a material, significant or substantial impact upon wages, hours or other conditions of employment and those which are only indirectly, incidentally or remotely related to employment conditions. The dissenting members of the Board pointed out, in effect, that equating the trifles here involved with subjects such as wages, hours, working conditions, job security, pensions, insurance, choice of bargaining representatives or other subjects directly and materially affecting "conditions of employment" is sheer nonsense.

Here, different groups of employees of Westinghouse Electric are represented by three separate unions while some are unrepresented. One of the three unions, representing only a relatively small percentage of the employees, undertakes to complain of the failure to bargain with it. We are told that the cafeteria employees of Baltimore Catering Company were granted wage increases negotiated by their bargaining representative, one of the two uncomplaining unions here, and that the increases in food prices were necessary by reason of increased operating costs.

The Board would require Westinghouse to bargain with the union at its specific request respecting the reasonableness of changes in cafeteria prices "made or to be

made." Just what may happen in the event the position of Westinghouse in such bargaining negotiations is unacceptable to the union is not clearly apparent. If this complaining union can force Westinghouse to engage in such bargaining the same right cannot be logically denied to the other two unions should they demand it. Voluntary and unsolicited efforts of the employer to provide facilities and services primarily for the convenience and accommodation of employees rise up to plague Westinghouse which cannot control prices and can attempt to exercise such control only by resort to the cancellation of the caterer's contract after giving the required notice. Being placed in such an unfair and unenviable position as ordered by the Board would hardly seem to be a suitable reward for such efforts. Conceivably, enforcement of the order could lead to disagreement, dissatisfaction, strife and turmoil.

In my view, it was not the intent of Congress in enacting the National Labor Relations Act to sweep *every act* by *every employer* within the ambit of "conditions of employment." We are reminded by the petitioner of situations and conditions which may *indirectly* affect the interests of employees. Bargaining representatives may argue that salaries of company officials are so high as to leave too little of company income for employees, that increases in the prices of company products will result in curtailed sales and less work for employees, that the company is spending too much or too little on research and development and is thereby jeopardizing future work opportunities or employee income, or, that the company is manufacturing products to be used in a war or shipped to a nation of which the union disapproves. To my knowledge these matters are not yet recognized as mandatory subjects for bargaining.

The Board in this case appears to follow its theory, as earlier articulated, that there is a duty imposed by Congress upon employers "to bargain collectively with their employees' representatives with respect to *any matter which might in the future emerge as a bone of contention between them,* provided, of course, it should be a matter 'in respect of rates of pay, wages, hours of employment, or other conditions of employment.' \* \* \*" See Weyerhaeuser Timber Company, 87 N. L. R. B. 672, 676 (1949). A theory may be applicable in proper context but efforts to apply it to clearly inappropriate situations should be discouraged where the results are, as charged by the petitioner, absurd and mischievous. Balanced and effective collective bargaining should be the ultimate objective. The statutory purpose may best be served by formulating, adopting, and applying a reasonable concept of "conditions of employment" in determining subjects of mandatory bargaining.

Undoubtedly the caterer is interested in maintaining a profitable volume of sales and the Westinghouse employees who avail themselves of the offered services are clearly in position to apply economic pressures in seeking to hold prices at reasonable levels. This power is recognized by the dissenting members of the Board when they refer to "the voluntary action of the marketplace." To borrow a portion of their concluding thrust— "when the cash register stops ringing" the silence is ominous.