**SEATTLE FIRST NATIONAL BANK,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 24613.

United States Court of Appeals,
Ninth Circuit.

June 11, 1971.

Ely, Circuit Judge, dissented and filed opinion.

⌖178

Bradley T. Jones, Stanley A. Carlson, of Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for appellant.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Jonathan M. Marks, Attys., NLRB, Washington, D. C., Charles M. Henderson, Regional Director, NLRB, Seattle, Wash., Thomas K. Cassidy, Seattle, Wash., for appellee.

Before HAMLIN, ELY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This matter is before us on the petition of Seattle First National Bank to review and set aside an order of the National Labor Relations Board finding that the bank had engaged in an unfair labor practice, and upon the cross-petition of the Board to enforce the order.[1] The jurisdiction of this court to review the order is conferred by 29 U.S.C. § 160(f).

The sole question on review is whether there is substantial evidence on the record considered as a whole to support the Board's conclusion that the bank's unilateral discontinuance of free investment services to its bargaining unit employees materially affected the terms and conditions of their employment within the meaning of Section 8(d) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(d), such that the bank was under a mandatory duty to bargain collectively with the union under Sections 8(a) (1) and (5) of the Act, 29 U.S.C. § 158(a) (1) and (5).[2]

For approximately 28 years prior to August 1, 1968, the bank's employees were not charged by the investment service department of the bank for services provided in effecting the purchase or sale of securities on their behalf. However, as the number of employee transactions increased to approximately 25 percent of all investment transactions handled by the department, the bank felt that it was economically necessary to impose a new rate schedule which increased services rates to non-employee customers and imposed, for the first time, a service charge on employees (union and non-union) equal to one-half of the regular fee charged to non-employees.[3] Transactions in the bank's own stock were exempted from the new rate schedule.

The decision to impose the investment service charges on employee transactions was unilaterally made by the bank. The union objected and offered to discuss the matter at the next round of contract negotiations. The bank refused to bar-

---

1. The Board's decision and order are reported at 176 NLRB No. 97.

2. Sections 8(a) (1) and (5) of the act provide:

 "(a) It shall be an unfair labor practice for an employer—

 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [i. e., Organization and Collective Bargaining];

 * * * * *

 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title [i. e., Representatives and Elections]."

 Section 8(d) provides:

 "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. * * * "

3. For example, the new rate for transactions in listed stocks for non-employee customers was set at 10 cents per share ($5.00 minimum), whereas the rate for employees was 5 cents per share ($2.50 minimum).

gain because it was of the opinion that it was not mandatorily required to do so. Because of the bank's refusal, an unfair labor practices charge was filed with the Board. The charge was denied by the bank, and a hearing was held.

The record before the Trial Examiner showed that during any one calendar year from the period of January 1, 1966, through August 1968, approximately 3 percent of the 3,000 bargaining unit employees effected transactions which would have incurred service charges under the new rate schedules. This small group of employees accounted for less than 11 percent of the total transactions that would have been subject to service charges after August 1, 1968. The transactions entered into by bargaining unit employees were outnumbered to a considerable extent by the transactions effected by the non-bargaining unit employees. And notwithstanding the recent dramatic increase in total employee investment activity as a percentage of all investment department business, the number of bargaining unit employees using the free services had remained almost constant during the period. The aggregate dollar value of the services to the bargaining unit employees was minimal. During the eight-month period from January 1, 1968, through August 1968, the investment service charges, if they had been imposed upon bargaining unit employee transactions, would have totaled $655.21 for the entire group.

The record also showed that the free investment services had never been reflected in a collective bargaining agreement with the union, nor had they ever been the subject of negotiations. There was no evidence that the free services had been held out as a fringe benefit to induce prospective employees to accept a job, or that the services had been the subject of any communication to the union or existing employees. In fact, there was no testimony that any of the employees, let alone the employer, had considered the free services as a term or condition of employment.

The Trial Examiner found that the existence of free investment services for the bank's employees was a condition of employment for the bargaining unit employees within the meaning of Section 8(d) of the Act. Thus, it was determined that the bank, by unilaterally imposing fees for these investment services, had violated its mandatory duty under Sections 8(a) (1) and (5) of the Act to bargain collectively with the employees' representative.

The Trial Examiner recommended that the bank cease and desist from refusing to bargain concerning the investment charges and from unilaterally altering the same. Affirmatively, it was recommended that the bank bargain upon request from the union; make whole any employee losses resulting from its unlawful conduct; and post the usual notices.

The Board adopted in full the findings, conclusions and recommendations of the Trial Examiner, without elaboration or critical comment.

 Only as to those matters enumerated in Section 8(d) of the Act is there a mandatory obligation to bargain under Section 8(a) (5). Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 210, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). And, as to those matters specified in Section 8(d), the phrase "terms and conditions of employment" is to be interpreted in a limited sense which does not include every issue that might be of interest to unions or employers.[4] Fibre-

4. "If, as I think clear, the purpose of § 8 (d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 223, 85 S.Ct. 398, 410, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring).

board Paper Products Corp. v. NLRB, *supra,* 379 U.S. at 220, 85 S.Ct. 398 (Stewart, J., concurring); Westinghouse Electric Corp. v. NLRB, 387 F.2d 542, 545 (4th Cir. 1967) (en banc). A mere remote, indirect or incidental impact is not sufficient. In order for a matter to be subject to mandatory collective bargaining it must *materially* or *significantly* affect the terms or conditions of employment. American Smelting & Refining Co. v. NLRB, 406 F.2d 552, 554 (9th Cir.), cert. denied, 395 U. S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969); Westinghouse Electric Corp. v. NLRB, *supra,* 387 F.2d at 547; NLRB v. Lehigh Portland Cement Co., 205 F.2d 821 (4th Cir. 1953).

██ Because of its expertise in the field, the Board's findings are, of course, entitled to considerable respect. However, when called upon to review an order of the Board, this court cannot accept the Board's determination as a matter of law, but instead must evaluate "the relevant facts of the particular case." American Smelting & Refining Co. v. NLRB, *supra,* 406 F.2d at 554. Moreover, "Congress has * * * made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We have evaluated the entire record and find that the evidence supporting the Board's decision is insufficient to establish that the bank's action in discontinuing the free investment services had a material impact on the terms or conditions of employment.

██ We find it difficult to understand how the use of the bank's investment service department by the employees at half-price or free of charge can be within the phrase "terms and conditions of employment." The purchase and sale of securities by employees

has little or nothing to do with their employment. The source of funds may or may not originate from employment. In the words of *Fibreboard Paper Products Corp., supra,* the pricing of such services is one of the management decisions "which impinge only indirectly upon employment security and should be excluded" from Section 8(d) matters.

The Trial Examiner concluded that the free services were an "emolument of value" accruing out of the employment relationship, and that the effect of their elimination on the terms and conditions of employment was not *de minimis*. The evidentiary support for this conclusion was stated as follows:

"I am not persuaded that what is here involved can properly be regarded as *de minimis*. Even if the abovementioned percentages were to remain constant in the future, as Respondent appears to assume, the value of the investment service to unit employees using it would, *over a period of years,* be substantial. Moreover, I cannot accept Respondent's assumption. In view of the substantial increase in utilization of the investment service by Respondent's employees, including unit employees, *it is at least possible* that there may be further increases in utilization by unit employees. In addition, contrary to Respondent's implication, the decisions which it cites do not establish the minimum limits of substantiality, and are not dispositive of the issue here presented. * * * For in addition to the question of Respondent's power to continue in effect the increases in investment service charges already imposed on unit employees, this case also involves Respondent's power to increase the service charges for such employees even further without negotiating with their bargaining representatives. And if Respondent can ignore the bargaining representative with respect to its investment service, it *might* take the position that it can act unilaterally with respect to a number of other services which it has been giving to its em-

ployees, such as effectuating sales and purchases of stock issued by Respondent without charge, free checking accounts, rental of safety deposit boxes at half price, and purchase of bank money orders without charge. [Footnote omitted]. *Over a period of years,* the total value of all the services now and heretofore received by unit employees at a reduced rate or free of charge *may be* quite substantial indeed." C.T. 20–21 (emphasis supplied).

The basis in the record upon which the Trial Examiner relied is illusory. Accumulating the aggregate value of the free services "over a period of years" merely camouflages the fact that the *percentage* of bargaining unit employees taking advantage of the services was extremely small. By itself, an aggregate figure for an undetermined period of years is meaningless. Broken down in terms of the value per unit employee per year, the record here clearly indicates that values would be insignificant. Furthermore, although "it is at least possible" that there might be increases in the future use of the free services by unit employees, it is equally as "possible" that the opposite could be true. There is no evidence in the record that either the percentage or number of unit employees utilizing these services had significantly increased in recent years. Finally, it was inappropriate to attempt to bolster the evidentiary basis for his conclusion by speculating as to the possibility that the bank might act unilaterally with respect to other free services which were not even the subject of the unfair practices charge. There was no evidence that the bank was planning on

further unilateral action or that it had even considered it.

In reaching his decision the Trial Examiner relied heavily on NLRB v. Central Illinois Public Service, 324 F.2d 916 (7th Cir. 1963); Westinghouse Electric Corp., 156 NLRB 1080; and McCall Corp., 172 NLRB No. 55. These authorities are not helpful to the Board's position. In *Central Illinois Public Service,* it was held that a unilateral discontinuance of a 33⅓% employee discount on gas, which was used for home heating purposes by somewhat less than half of the unit employees and which was worth on the average $48 per year per employee, was a violation of the Act. The materiality of the impact, of course, was significantly greater than that involved here. Moreover, the court noted that the employer in that case had stated on occasion that the gas discount benefits should not be ignored when comparing wages with other employees who were not offered the discount. 324 F.2d at 917. In other words, there was a basis in the record, not present here, to show that the employer had in fact held out the discount as a substantial employee benefit.[5]

In *Westinghouse, supra,* the Board held that the employer violated the Act by refusing to bargain with the union with respect to minor changes in food prices charged at a plant cafeteria by an independent caterer. The Board's decision was enforced by a panel of the court of appeals. Westinghouse Electric Corp. v. NLRB, 369 F.2d 891 (4th Cir. 1966) (Boreman, J., dissenting). However, on rehearing en banc, the panel's decision was reversed, the court holding that the price changes did not have a

---

5. We also recognize a significant difference in the basic nature of the benefits involved. In *Central Illinois Public Service,* the gas discount was directly related to a common household expense (i. e., heating costs) which a great many bargaining unit employees might well incur. Depending upon the type of home heating unit an employee possessed, the discount was of obvious immediate and continuous value. On the other hand, the very nature of free investment services dictates that they are of value only to the small number of employees actively trading in securities. Investment service costs are not an immediate and continuous living expense, and consequently, are unlikely to have any influence on employment decisions for an overwhelming majority of the labor force.

material or significant relationship to wages, hours or other conditions of employment. 387 F.2d 542 (4th Cir. 1967) (Sobeloff, J., and Craven, J., dissenting).[6]

In *McCall Corp., supra,* the Board was confronted with a situation similar to that in *Westinghouse* in which there had been minor price changes by the employer in three vending machine food items. The Board refused to accord any weight to the fact that matter in issue was only of "trifling" importance and found that, since the employer had the power to change the prices of any and all food items, the price changes in question were a condition of employment. On review, the court of appeals recently denied enforcement of the Board's order in *McCall,* relying solely on *Westinghouse, supra.* McCall Corp. v. NLRB, 432 F.2d 187 (4th Cir. 1970) (Sobeloff, J., dissenting).[7]

In addition to the insufficiency of the evidentiary basis in the record to support the Board's order, we are inclined to point out, as did the court in *Westinghouse,* that "[t]he case before us does not even remotely involve any question of job security or any other issue which employees could traditionally consider 'vital'."[8] 387 F.2d at 548.

The petition is granted and the order of the National Labor Relations Board herein is set aside; and the Cross-Petition of the Board for enforcement of its order is denied.

ELY, Circuit Judge (dissenting):

I respectfully dissent. In doing so, however, I state at the outset that I accept the proposition that "[in] order for a matter to be subject to mandatory collective bargaining it must *materially* or *significantly* affect the terms or conditions of employment." My thesis is that even if my Brothers have correctly classified the bank's free investment service as *financially* "insignificant," it should *not* then follow ("as the night the day") that the benefit cannot materially affect a "term or condition of employment" as that phrase in section 8(d) of the Labor Act should be interpreted. A definition, being a rule of application, should be applied, not blindly, but with due consideration for the purpose of the rule.[1] In the present context, the crucial result of interpreting the phrase so as to include free investment services is to make the latter a mandatory bargaining subject. Hence, our attention should first be directed to the reasons for mandatory bargaining.

The purpose of the Labor Act itself is "to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed.2d 233 (1964). As our distinguished counterpart, Judge Craven, writing for a panel of his court in Westinghouse Electric Corp. v. NLRB, 369 F.2d

---

6. The Trial Examiner noted the *en banc* decision in *Westinghouse* but did not consider himself bound by it. C.T. 22.

7. The court of appeals in *McCall* made it clear that its *en banc* decision in *Westinghouse* did not hinge upon the fact that the employer there had only indirect control of cafeteria food prices.

8. For example, discriminatory discharges, seniority rights, compulsory retirement age and grievance procedures, *see* Westinghouse Electric Corp. v. NLRB, 387 F.2d 542, 548 n. 4; group insurance plans, W. W. Cross Co. v. NLRB, 174 F.2d 875 (1st Cir. 1949); merit increases,

NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); profit-sharing plans, Kroger Co. v. NLRB, 401 F.2d 682, 687-688 (6th Cir. 1968), cert. denied, Amalgamated Meat Cutters, etc. v. Kroger Co., 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969); regular bonuses, Beacon Journal Publishing Co. v. NLRB, 401 F.2d 366 (6th Cir. 1968); and rents on company housing, American Smelting & Refining Co. v. NLRB, 406 F.2d 552 (9th Cir.), cert. denied. 395 U.S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969).

1. *See* Bishin, The Law Finders: An Essay in Statutory Interpretation, 38 S. Cal.L.Rev. 1 (1964).

891, 895 (4th Cir. 1966), rev'd en banc, 387 F.2d 542 (1967), expressed it:

> "The underlying philosophy of the Labor Act is that discussion of issues between labor and management serves as a valuable prophylactic by removing grievances, real or fancied, and tends to improve and stabilize labor relations. Experience teaches that major work interruptions may spring from seemingly trivial causes."

Thus, the prevention of economic warfare would seem to require that "terms and conditions of employment" be interpreted broadly enough to encompass those "seemingly trivial" disputes which have often proved likely to cause "major work interruptions.[2] Moreover, the Board, with its special expertise and experience in gauging the type of conduct which does usually portend greater conflict, should be accorded special deference as we review its interpretation in the circumstances of a particular controversy. *See* NLRB v. Int'l Hod Carriers, etc., Local No. 1082, 384 F.2d 55 (9th Cir.), cert. denied, 390 U.S. 920, 88 S.Ct. 853, 19 L.Ed.2d 980 (1967).

I do not say that financial impact is not important. As I see it, however, it is only one of several factors bearing on the "materiality" of a matter affecting a condition of employment. In this case, the percentage of unit employees who had availed themselves of the withdrawn benefit is another. But a third factor is the extent to which comparable alternatives are available, and a fourth is the possible existence of a scheme of benefits with a material aggregate effect, but whose components are not individually material.

Applying these factors to the facts at hand, it appears at first glance that the percentage of employees who enjoyed the benefit was minimal. Only 3% requested the free investment services in any one calendar year from January 1, 1966 to August 1, 1968. However, the record does not reveal if it was the same 3% each year, or a different 3%. If the latter, it is possible that as many as near 10% of the employees in the unit made use of the services at one time or another.[3]

It is unnecessary that I rest my dissenting conclusion either on the materiality of the investment service, considered alone, or on my belief that the majority's approach does violence to the un-

---

2. *See* Ross, The Government as a Source of Union Power: The Role of Public Policy in Collective Bargaining, 155–59, 262–265 (Brown University Press, 1965). The legislative history of 8(d), in which the phrase "terms and conditions of employment" appears, supports this proposition. This section was drafted during consideration of the Taft-Hartley Act in 1947. The House version sought specifically to enumerate the proper subjects to which collective bargaining should be limited. I Legislative History of the Labor Management Relations Act, 1947, 163–67, 313–14 (G.P.O.1948). This version was successfully opposed in the Senate. Opponents argued, *inter alia*, that the range of proper subjects for collective bargaining "should not be straitjacketed by legislative enactment," I Leg. History 362.

In urging a restrictive interpretation, the majority relies on Mr. Justice Stewart's concurring opinion in Fibreboard Paper Products v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), wherein the distinguished Justice wrote that

> "those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from [mandatory bargaining]."

379 U.S. at 223, 85 S.Ct. at 410. Our case, however, unlike those which concerned Mr. Justice Stewart, does not involve a "managerial decision * * * which lie[s] at the core of entrepreneurial control * * * [such as] the commitment of investment capital and the basic scope of the business." 379 U.S. at 223, 85 S.Ct. at 409. Further, threats to "employment security" may be no less real for their lack of abstract financial impact.

3. For this reason, I question the accuracy of the majority's opinion that the free investment services are "of value only to the *small* number of employees actively trading in securities." (Emphasis supplied).

derlying philosophy of the Labor Act. The free investment service should be seen as one benefit in a scheme of benefits which the bank's employees had enjoyed for many years, none of which was ever the subject of bargaining. The unit employees have free checking account privileges, pay no service fee for money orders, and may open safety deposit boxes for half the normal customer service charge.[4] Presumably, if the bank had unilaterally decided to withdraw any one of the services, it would have carried the day with the same arguments that have persuaded the majority. Thus, while these services, in the aggregate, may be presumed to affect a considerable number of unit employees,[5] the bank may, piece-meal, end a series of benefits that it surely could not unilaterally terminate at one time.

The majority rejects this reasoning. It says, rightly, that nothing in the record indicates that the bank has any such oppressive scheme in mind. However, the employer's good faith is not the issue.[6] The issue is its ability—not its intention—to peck away, with the approval of a Court of Appeals, at a bundle of employee benefits until none of the components remains. In NLRB v. Central Illinois Public Service, 324 F.2d 916 (7th Cir. 1963), a board order against a gas company was enforced when the company unilaterally discontinued a 33⅓% discount it had offered to employee-customers of its heating gas. Fewer than half of the unit employees had taken advantage of the discount, and, as to each, it was calculated that the benefit was worth $48 per year, only four dollars per month. The majority dismisses this case summarily as one in which there was a significantly greater

material impact than is here involved. Let us suppose, however, that the gas company, instead of totally eliminating the discount, had merely decreased it by 8⅓% to 25%? Was it not the fact of the employer's unilateral action, rather than the extent, which controlled the Seventh Circuit's disposition?

I would be mistaken to place great reliance on *Central Illinois*, just as I believe that my Brothers are mistaken in resting so much on the *en banc* decision in *Westinghouse, supra,* and upon the subsequent Fourth Circuit opinion in McCall Corp. v. NLRB, 432 F.2d 187 (1970). In this area, none should rely too greatly on isolated decisions of other courts. As our court has recently emphasized, the determination as to whether a given issue materially affects the conditions of employment "depends upon an evaluation of the relevant facts of the particular case." American Smelting and Refining Co. v. NLRB, 406 F.2d 552 (9th Cir. 1969).

*Westinghouse* and *McCall Corp.* concerned cafeteria food prices. There is no indication in either of the opinions that comparable alternatives to the company cafeteria were absent. It was this lack of isolation to which I principally attribute the conclusions resolved in *Westinghouse* and *McCall Corp.*

"Here, as in Westinghouse, the employees had other places to eat or they could bring their own lunches. In neither instance were the plants so isolated that employees were dependent on the food that caused the controversies. It is this circumstance that chiefly distinguishes these cases from Weyerhaeuser Timber Co., 87 NLRB 672, 25 LRRM 1163 (1947)."

---

4. Unit employees have also been entitled to preferred interest rates on bank loans. However, this benefit has been the subject of discussion in the past.

5. The record is silent on this point; however, it is undeniable that the bundle affects far more employees in percentage and in dollar amount than does the investment service alone.

6. Good faith, of course, does not cure an employer's mistaken assumption that a disputed matter is not a subject of mandatory bargaining. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Central Illinois Public Service Co., 324 F.2d 916 (7th Cir. 1963).

*McCall Corp., supra*, 431 F.2d at 188. Here, it is undisputed that alternative free investment services are not available to the bank's unit employees.

In terminating my comments, I record my prediction that our court will soon regret its issuance of the majority opinion in this case. The opinion needlessly overturns a carefully considered Order issued by the Board and will inevitably, I think, encourage some employers and employees alike to inflict petty irritations upon the other. The consequences could not only gravely disrupt harmonious employer-employee relationships in the vast geographical area embraced by our Circuit, but it could also burden the Board with a new flood of petty controversies and further congest the work of our court, already so heavy as to be almost unendurable.

I hold no sympathy for either of the disputants in the present case. As I see it, both of them have imposed upon the Board and upon us. The bank terminated the employee benefit only weeks before it and its employees' representatives were scheduled to negotiate a new contract. I realize that the employee representative, confronted with bitter complaints of its members, may have then believed that it had no face-saving choice except to seek the intercession of the Board. As a practical matter, however, it could have stayed its hand until the scheduled time for the negotiations. Without doubt, it could have then obtained future benefits which might have offset or exceeded those which had been withdrawn. On the other hand, the bank's officer could have more appropriately withheld his arrogant, unilateral action until the very imminent time when the bank could have honorably and forthrightly presented its position in face-to-face negotiations with the employees' representative.

From the fact that the bank maintains scores of branches, I assume that it has previously enjoyed a prestigious commercial reputation, and I would have thought that such an institution would have resisted any inclination to treat its servants so cavalierly. It has won a victory of sorts in this case, but when the word of its triumph filters down through the ranks of its workmen and into the ears of the public, the victory which the majority gives it will surely, in the end, be Pyrrhic.

I would deny the bank's petition for review and grant the Board's cross-application for enforcement of its order.