**WESTINGHOUSE ELECTRIC CORPO-RATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 10545.**

United States Court of Appeals Fourth Circuit.

Reheard April 4, 1967.

Decided Nov. 6, 1967.

---

John G. Wayman, Pittsburgh, Pa. (Leonard L. Scheinholtz, Paul A. Manion, and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on brief), for petitioner.

Glen M. Bendixsen, Attorney, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Michael N. Sohn, Attorney, N. L. R. B., on brief), for respondent.

Benjamin Werne and William Roth, New York City, on brief for National Automatic Merchandising Ass'n, *amicus curiae.*

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER and CRAVEN, Circuit Judges, sitting en banc.

BOREMAN, Circuit Judge:

The principal question here involved may be stated as follows: Upon the record considered as a whole, were increases in food prices (a penny for carry-out coffee and five cents for hot food entrees) established by an independent contractor operating cafeterias in Westinghouse plants a mandatory subject for collective bargaining between Westinghouse Electric Corporation and Salaried Employees Association, a union representing some of the Westinghouse employees?

A striking feature of this litigation is the sharp division of opinion at every stage. The marked differences of opinion suggest that the question here is both novel and troublesome.

Reviewing the history of this case, we find that it was initiated by an unfair labor practice charge filed in January 1965 by the Salaried Employees Association (hereafter S.E.A. or union) with the Regional Director of the National Labor Relations Board, Region 5, Baltimore, Maryland. On February 17, 1965, the Regional Director refused to issue a complaint, reporting that his investigation failed to indicate a violation. S.E.A. appealed to the General Counsel who ordered the Regional Director to issue a complaint.

After a hearing, the Trial Examiner found that Westinghouse had violated sections 8(a) (1) and (5) of the National Labor Relations Act and recommended that Westinghouse be required to bargain with the union with respect to any changes in cafeteria food prices.

The Board disagreed with the Trial Examiner's recommendation and the five members of the Board divided among themselves. Three of the members said the Examiner's recommended order was impracticable and that bargaining about every change in food prices before putting such a change into effect could not be approved. Nevertheless, they issued an order requiring bargaining in response to a "specific union request for bargaining about changes made or to be made." The other two Board members filed a vigorous dissent.

Westinghouse filed a petition for review and the matter was heard by a panel of three judges of this court. Two judges determined that the Board's order should be enforced while the third filed a dissenting opinion favoring denial of enforcement. Westinghouse filed a petition for rehearing and a rehearing before the court en banc was ordered. The view of a majority of the participating judges of this court on this rehearing is that enforcement of the Board's order should be denied.

The facts which will be merely highlighted here are set out in the majority and dissenting opinions of this court's three-judge panel.[1]

Westinghouse operates a complex of plants, known as the Defense Center, and involved herein are cafeterias housed at the company's Friendship, Lansdowne and Parker Road sites, several miles from downtown Baltimore. Cafeteria facilities servicing these plants are operated by the Baltimore Catering Company (hereafter the caterer) under contract with Westinghouse. Pursuant to the contract, the caterer pays Westinghouse a rental of One Dollar per year and Westinghouse provides the capital equipment necessary to operate the facilities. Either party to the contract has the absolute right, at any time, to terminate the contract upon sixty-days' written notice. The contract provides: "9. The quality and prices of the meals served, and the hours of service thereof, in said cafeterias shall at all times be reasonable." Westinghouse has the right to conduct periodic audits of the cafeteria accounts and to have submitted to it daily deposit slips and a monthly record of sales.

Between forty and forty-five percent of the Westinghouse employees ate lunches

---

1. Westinghouse Electric Corporation v. N.L.R.B., 360 F.2d 891 (4 Cir. 1966).

at the cafeterias during the period in question. However, the majority of employees carried their own lunches, supplementing them with beverages obtained from vending machines.[2] Few, if any, employees left the company's premises for lunch since the shortness of the lunch periods would not permit employees to travel to off-the-premises eating places, obtain service and return.

In October 1964 the caterer announced that it intended to increase cafeteria food prices. Thereafter S.E.A., one of three unions representing Westinghouse employees, sought to meet with the company to discuss these price increases. Westinghouse arranged for meetings of the S.E.A. with the caterer in the office of the company's Industrial Relations Representative, but Westinghouse adopted the position, which it has maintained throughout this litigation, that it could not discuss these matters or bargain concerning them with the union because it had no power to fix or control the prices of food items served in the cafeterias by the independent contractor, the caterer. Although a Westinghouse representative was present on occasions he did not participate in any of the discussions.

In January 1965 the caterer posted notices of an increase of five cents in the price of hot food entrees and an increase of one cent in the price of carry-out coffee. According to the caterer, this increase was necessitated by rising operating costs attributable to wage increases granted by it to its own union employees as a result of collective bargaining. Again the S.E.A. sought to negotiate with Westinghouse concerning these price increases and again Westinghouse refused. It was then that the union initiated this litigation.

The three majority members of the Board appeared to base their decision on the fact that Westinghouse supplied the cafeteria in order to attract employees who otherwise would not accept employment there if eating facilities were not provided. The majority of the panel of this court which upheld the Board's order accepted the Board's reasoning but stressed the fact that Westinghouse, by contract, retained and exercised "extensive power over cafeteria policies." 369 F.2d at 896. The court majority relied in large measure upon the portion of the contract which stated that the food quality and prices must be reasonable and that Westinghouse could terminate the contract upon sixty-days' notice. The majority of the Board and the majority of the three-judge panel of this court held that the cafeteria prices were, under the circumstances of this case, "conditions of employment" within the statutory meaning of these words as used in the Act,[3] and a mandatory subject of bargaining between the plant owner and one of the plant unions.

The statutory phrase—"terms and conditions of employment"—according to the Board, is intended by Congress to be used in its "broadest sense" and encompasses virtually everything which bears on the employment relationship and to which workers seek management's agreement. However, the legislative history does not support the Board's view of congressional intent and design. At best, the history merely shows that Congress

2. There was some testimony to suggest that doughnuts and coffee could be obtained from "Chuck Wagons" which parked on or near the plant's parking lots.

3. The pertinent statutory language is as follows:

"[8](a) It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of

section 159(a) of this title." 29 U.S. C. § 158(a) (5).

The words "to bargain collectively" are explained to some extent by section 8(d) which provides:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." 29 U.S.C. § 158(d).

did not desire to enumerate specific bargaining subjects; it does not show that the phrase was meant to embrace every issue that might be of interest to unions or employers. To the contrary, as Mr. Justice Stewart stressed, in his concurring opinion in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 220–221, 223–224, 85 S.Ct. 398, 408–410, 13 L.Ed.2d 233 (1964):

> "It is important to note that the words of the statute are words of limitation. The National Labor Relations Act does not say that the employer and employees are bound to confer upon any subject which interests either of them; the specification of wages, hours, and other terms and conditions of employment defines a limited category of issues subject to compulsory bargaining. The limiting purpose of the statute's language is made clear by the legislative history of the present Act. As originally passed, the Wagner Act contained no definition of the duty to bargain collectively. In the 1947 revision of the Act, the House bill contained a detailed but limited list of subjects of the duty to bargain, excluding all others. In conference the present language was substituted for the House's detailed specification. While the language thus incorporated in the 1947 legislation as enacted is not so stringent as that contained in the House bill, it nonetheless adopts the same basic approach in seeking to define a limited class of bargainable issues.

> "The phrase 'conditions of employment' is no doubt susceptible of diverse interpretations. At the extreme, the phrase could be construed to apply to any subject which is insisted upon as a prerequisite for continued employment. Such an interpretation, which would in effect place the compulsion of the Board behind any and all bargaining demands, would be contrary to the intent of Congress, as reflected in this legislative history.

> \*　　\*　　\*　　\*　　\*

If, as I think clear, the purpose of § 8 (d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.

> "Applying these concepts to the case at hand, I do not believe that an employer's subcontracting practices are, as a general matter, in themselves conditions of employment. Upon any definition of the statutory terms short of the most expansive, such practices are not conditions—tangible or intangible—of any person's employment."

In *Fibreboard,* the company operated a manufacturing plant at which United Steel Workers of America represented the company's maintenance employees working on the premises. The agreement with the union was about to expire when the company informed the union that after a study it had decided to engage an independent contractor to perform these maintenance services. The company expressed the view that in the light of its decision negotiation of a new contract would be pointless. At the termination of the contract the employment of the maintenance workers was ended and a subcontractor's employees began doing this work. The Board held that under those circumstances the company was under a duty to bargain with the union; the Court of Appeals for the District of Columbia Circuit decreed enforcement of the Board's order and the Supreme Court affirmed. The Court pointed to the fact that it was a widespread industrial practice to include the subject of "contracting out" within the collective bargaining process and that the contracting out of work performed by members of the bargaining unit might appropriately be called a condition of employment.

The view expressed by Mr. Justice Stewart in his concurring opinion, in which he was joined by Justices Douglas and Harlan, is in harmony with the view on the scope of mandatory bargaining

expressed in the Court's opinion in *Fibreboard* by Chief Justice Warren:

"We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy." 379 U.S. at 215, 85 S.Ct. at 405.

Thus, it appears that the Supreme Court's decision in *Fibreboard* was limited to a particular situation involving the job security of members of the bargaining unit which was threatened not merely by the transfer of work to other employees but by the transfer of work to be done on the premises. However, Mr. Justice Stewart noted: "[I]t surely does not follow that every decision which may affect job security is a subject of compulsory collective bargaining." 379 U.S. at 223, 85 S.Ct. at 409.

In its briefing and arguing the instant case, the Board is apparently unwilling to acknowledge that in determining whether a given matter should be deemed a mandatory bargaining subject, the courts, as well as the Board itself, have recognized a legal distinction between those subjects which have a material or significant impact upon wages, hours, or other conditions of employment, and those which are only indirectly, incidentally, or remotely related to those subjects.

The Board cites with approval N. L. R. B. v. Lehigh Portland Cement Co., 205 F.2d 821 (4 Cir. 1953), in support of its conclusion that the instant case involves a mandatory bargaining subject but we think that case is wholly distinguishable on its facts from the instant case. There the employer owned the houses which were rented to the employees and directly fixed and charged the rentals. The rent in most instances was deducted from the employees' pay checks. There had been no rent increases for fourteen years and the rents which had been in effect were apparently below the prevailing rate in the area. The employer's ownership and control of houses "hard to get" gave the employer a means of affecting the living conditions of employees through the power of granting or withholding the privilege and of fixing terms upon which the power could be exercised. Referring to the company-owned houses and renting them to employees, the court stated: "It is sufficient to bring them within the field of collective bargaining if their ownership and management *materially* affects the conditions of employment." (Emphasis added.) 205 F.2d at 823. This court there reached the conclusion that because the company's ownership and rental of the houses involved had a *substantial* effect upon conditions of employment, increasing the rent was a mandatory subject of bargaining.

It is interesting to note that Fibreboard Paper Products Corp. v. N. L. R. B., supra, 379 U.S. 203, 85 S.Ct. 398, in which it was held that the "contracting out" there involved was a statutory subject of collective bargaining, was decided in 1964. Subsequently, the subject of "contracting out" was considered by this court in District 50. United Mine Workers, etc. v. N. L. R. B., 358 F.2d 234 (4 Cir. 1966). We there held that an employer's decision to subcontract work was *not* a mandatory bargaining subject because there was no evidence of a significant impact on the employees from which the Board could find that the employer, by deciding to subcontract, violated its duty to bargain. It was pointed out that no employees in the maintenance department had been laid off and that some employees had refused additional overtime assignments. The court agreed with the Board that the record failed to show any substantial loss of work which might create a significant adverse impact on the employees. "We add, however, that were the impact substantial, the full-scale bargaining contended for by the union would

not necessarily be appropriate. There is a difference between a decision to close a department with consequent layoffs, and decisions to subcontract which may result in less serious deprivations. It is a matter of degree and the statutory bargaining requirements should be flexibly administered to meet the needs of the particular case." 358 F.2d at 238.

■ In the instant case we arrive at the conclusion, one which we believe is not inconsistent with past pronouncements of this court, that since practically every managerial decision has some impact on wages, hours, or other conditions of employment, the determination of which decisions are mandatory bargaining subjects must depend upon whether a given subject has a significant or material relationship to wages, hours, or other conditions of employment.

The case before us does not even remotely involve any question of job security or any other issue which employees could traditionally consider "vital." [4] Nor is there any evidence that the inclusion of this issue here within the collective bargaining framework is a widespread industrial practice.

In Weyerhaeuser Timber Company, 87 NLRB 672, decided in 1949, the Board said that Congress intended to impose upon employers a duty to bargain collectively with their employees' representatives with respect to *any matter which might in the future emerge as a bone of contention between them,* provided, of course, that it should be a matter in respect to rates of pay, wages, hours, or other conditions of employment. But that rule adopted in *Weyerhaeuser* is no longer the rule as evidenced by the statements of the Supreme Court in the *Fibreboard* case. The issue in *Weyerhaeuser* resembles the issue here only superficially although the Board majority attempts to equate the two cases. In that case the Board held that an employer who operated a logging camp deep in the Oregon woods, far removed from any sizable community, had a statutory duty to bargain with the employees over the price of meals provided by the employer. Apparently most of the employees depended on the company kitchens for all their meals and lacked any available alternatives. The employer set the prices and provided the food. There was no third-party independent contractor involved and the employer was in position to derive the profit, if any, from the service. Under those circumstances and taking into consideration the fact that the employees were virtually captive customers, it is easy to appreciate the Board's concern that collective bargaining on that subject should be considered mandatory. In the instant case the caterer, not Westinghouse, determined the prices of the food and coffee served in the cafeterias; Westinghouse employees, during the work week, ate no more than one meal a day at the company cafeterias and the fact that less than forty-five percent of the company's employees used the cafeteria facilities shows that there were other available alternatives. The difference between a lumber camp bunkhouse and cookhouse and a plant cafeteria in a Defense Center employing over 7500 persons should be apparent. Undoubtedly most of the employees at Weyerhaeuser were compelled to live at the bunkhouse and eat at the cookhouse. But not one single employee of the Defense Center is either required or permitted to live in the plants, no one is required to buy meals at the cafeterias, and a majority of the employees do not.

In the case before us, the Board majority engages in a flight of fancy to

4. For example, discriminatory discharges, N.L.R.B. v. Bachelder, 120 F.2d 574 (7 Cir. 1941); seniority rights, Oneita Knitting Mills, Inc. v. N.L.R.B., 375 F.2d 385, 388 (4 Cir. 1967); Industrial Union of Marine & Shipbuilding Workers of America v. N.L.R.B., 320 F.2d 615, 620 (3 Cir. 1963); the imposition of compulsory retirement age, Inland Steel Co. v. N.L.R.B., 170 F.2d 247, 12 A.L.R.2d 240 (7 Cir. 1948); and grievance procedures, Industrial Union of Marine & Shipbuilding Workers of America v. N.L.R.B., supra, 320 F.2d at 620; N.L.R.B. v. Century Cement Manufacturing Co., 208 F.2d 84 (2 Cir. 1953).

bring the situation within its *Weyerhaeuser* rule and we find its decision to be based upon unsupported conclusions. It says:

" * * *. Respondent has cafeterias on its premises because there are inadequate dining facilities within a reasonable distance of its plants. If it did not have these facilities, it would not be able to attract the necessary number of employees to man its plants. In practical terms, on-site eating facilities are held out to the employees and prospective employees as an inducement to work for Respondent. They are thus conditions of employment. The problem is as simple as that. * * *."

We do not find one word of testimony to support the conclusion that Westinghouse would be unable to attract the necessary number of employees to man its plants if it did not provide cafeteria space. There is no testimony to support the conclusion that on-site eating facilities are held out as an inducement to work for Westinghouse. The Board majority then says:

"The fact is that a considerable number of employees do not wish to bring their lunches from home, and if they had to do so would *presumably* look for employment elsewhere. Such employees are in substance and effect captive customers of the on-site cafeterias, * * *." (Emphasis supplied.)

As indicated, the conclusion that the employees who do buy lunches at the cafeterias would quit good jobs at high pay if they had to bring their own lunches is only a *presumption,* one unsupported by any evidence. Certainly no one suggested that an employee had to buy meals at the cafeterias or resign his job. Precisely the contrary is true. Most of the employees do not buy their lunches there and, of course, they have not quit their jobs. Stripped of unsupported presumptions and guesses, the statement of the Board majority is that anyone who prefers buying his meals in a cafeteria to bringing his lunch from home is, for that reason, a captive customer of the cafeteria. The only compulsion is the individual's own desire or preference, which is precisely the same as saying that there is no compulsion. If the plant were entirely surrounded by restaurants, the same individual might prefer eating in the cafeteria which, under the Board's reasoning, would make him a "captive customer." No one testified that it was impossible or even inconvenient for any employee to bring his lunch from home if he decided not to buy his lunch or coffee at the cafeteria. Thousands do exactly that without any loss of time, loss of wages, disciplinary action, or any other ill effect.

Of some 7500 employees who are potential users of the cafeterias, only about 2500 are represented by S.E.A. About 1400 are represented by the I.B.E.W., 500 by the I.U.E., and over 3000 are unrepresented, including professionals and management personnel. So, it appears that 5000 of these potential users never selected S.E.A. to represent them for anything, and almost 2000 of them selected two other unions. Yet the Board would require Westinghouse to bargain with S.E.A. at the union's specific request respecting the reasonableness of changes in cafeteria prices "made or to be made." As the author of this opinion said in stating his disagreement with this court's decision enforcing the Board's order:

"Just what may happen in the event the position of Westinghouse in such bargaining negotiations is unacceptable to the union is not clearly apparent. If this complaining union can force Westinghouse to engage in such bargaining the same right cannot be logically denied to the other two unions should they demand it. Voluntary and unsolicited efforts of the employer to provide facilities and services primarily for the convenience and accommodation of employees rise up to plague Westinghouse which cannot control prices and can attempt to exercise such control only by resort to the cancellation of the caterer's contract after giving the required notice. Being placed in such an unfair and unenviable posi-

tion as ordered by the Board would hardly seem to be a suitable reward for such efforts. Conceivably, enforcement of the order could lead to disagreement, dissatisfaction, strife and turmoil." 369 F.2d at 899.

■ The Board would order Westinghouse to bargain with S.E.A. about prices charged by the independent caterer with full knowledge that Westinghouse cannot make an enforceable contract to change those prices since it does not set them. This court long since decided that the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions. In N. L. R. B. v. Highland Park Mfg. Co., 110 F.2d 632, 637 (4 Cir. 1940), the late Judge Parker, writing for the court, stated:

> " * * *. The requirement to bargain collectively is not satisfied by mere discussion of grievances with employees' representatives. It contemplates the making of agreements between employer and employee which will serve as a working basis for the carrying on of the relationship. * * *."

The Board calls upon Westinghouse to here engage in that very form of fictional bargaining condemned in the *Highland Park* case.

■■ In the view of the majority of this court, it was not the intent of Congress in enacting the National Labor Relations Act to sweep every act by every employer within the ambit of "conditions of employment." The dissenting members of the Board pointed out, in effect, that equating the trifles here involved with subjects such as wages, hours, working conditions, job security, pensions, insurance, choice of bargaining representatives or other subjects directly and materially affecting "conditions of employment" is sheer nonsense. Efforts to apply a theory such as the Board adopted in *Weyerhaeuser* to clearly inappropriate situations should be discouraged where the reasons for such attempted application are, as charged by the petitioner,

absurd and mischievous. Balanced and effective collective bargaining should be the ultimate objective. The statutory purpose may best be served by formulating and applying a reasonable concept of "conditions of employment" in determining subjects of mandatory bargaining. We find in this case no condition of employment which is a subject of mandatory bargaining.

In the circumstances, we reach the conclusion that the Board's order should not be enforced. The earlier decision of this court, reported at 369 F.2d 891, will be overruled.

Enforcement denied.

SOBELOFF and CRAVEN, Circuit Judges (dissenting):

When the Board itself is divided about policy, there is an understandable temptation for judges to declare and implement it. But it is well to remember that the Board's conclusions (even though not unanimous) may "express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions." Chicago, B. & Q. Ry. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636, 640 (1907). The Board was created for the purpose of using its judgment and its knowledge. As the Supreme Court said in Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, 1283 (1941), "[t]here is an area plainly covered by the language of the Act and an area no less plainly without it * * *. [C]ourts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy."

It seems to us that whether or not an in-plant cafeteria is a condition of employment involves the fact finding function and the policy formulating function of the Labor Board, and, with all deference to our brethren, we adhere to the majority opinion of the panel as set out in Westinghouse Elec. Corp. v. NLRB, 369 F.2d 891 (4 Cir.1966).