[Civ. No. 69381. Second Dist., Div. Three. June 5, 1984.]

LONG BEACH POLICE OFFICER ASSOCIATION et al.,
Plaintiffs and Respondents, v.
CITY OF LONG BEACH et al., Defendants and Appellants.

COUNSEL

Robert W. Parkin, City Attorney, and Gerarde F. Imhoff, Deputy City Attorney, for Defendants and Appellants.

Hannon & Schelly and Michael Hannon for Plaintiffs and Respondents.

OPINION

LUI, J.—

SUMMARY

Appellants, the City of Long Beach (City), the Long Beach Police Department (Department), and the Chief of Police, Charles Ussery (Chief), appeal from a judgment granting respondents' (Long Beach Police Officers Association (POA), Timothy Ferrill, Richard Brewer and Diana Munoz), petition for a writ of mandate.

Said judgment ordered the issuance of a peremptory writ of mandate prohibiting the appellants from denying the Department's officers a "past practice" of consultation with a POA representative or an attorney prior to making oral and written reports concerning incidents in which an officer was involved in a shooting.

The collective bargaining agreement between the parties is contained in a memorandum of understanding (MOU) and specifically prohibits the reduction in "consistently applied past practices" unless the parties mutually agree to such reduction in writing "prior to implementation." We hold that this practice cannot be unilaterally terminated by appellants and does not violate public policy. Accordingly, we affirm the judgment entered below.

FACTUAL BACKGROUND AND PROCEEDINGS BELOW

The City and the POA executed the MOU in the latter part of 1980, which was to be effective until June 30, 1983. The MOU sets forth the contractual obligations between the City, its police officers, and the POA.

Section I, article Four, of the MOU provides in pertinent part as follows: "It is understood by and between the parties that the intent as set forth herein shall be to cover the wages, hours and *working conditions* of the

employees represented by the [POA]. *It is agreed that there will be no reduction by virtue of this agreement in existing consistently applied past practices and those written personnel policies and procedures, general orders, department policies, rules and regulations approved by the Chief which affect wages, hours or existing working conditions except in an emergency unless mutually agreed upon in writing by the parties prior to implementation.* Except as specifically modified by this MOU, these rules and regulations, and policies and any subsequent amendments thereto shall be in full force and effect during the term of this MOU. Before any new or subsequent amendments to these policies or departmental rules and regulations directly affecting wages, hours and terms and conditions of employment are implemented, the City through the Chief of Police, shall meet in accordance with Government Code Section 3500 et seq. with the [POA] regarding such changes." (Italics added.)

In February 1982, the Chief issued a directive prohibiting the City's police officers who became involved in a shooting from consulting with a representative of the POA or an attorney prior to the filing of a written or oral report concerning such incident. The Chief had determined that the directive was necessary because of prior instances in which an officer's consultation with an attorney or POA representative had interfered with the Department's investigation of such incident.

Appellants deny that such consultations with a POA representative or an attorney are a "consistently applied past practice," as defined in the MOU. Respondents, on the other hand, contend that the practice had been in existence for some 11 or 12 years prior to the Chief's directive.

At the POA's request, the Chief and other Department representatives met on May 10 and 14, 1982. At these meetings, appellants indicated they could not agree to any modification of the Chief's directive. The POA asserted its right to represent or counsel officers who became involved in such incidents. During the meetings, there was discussion between the parties as to whether the directive was a change in an existing policy or procedure. The POA made no specific proposals to appellants but assured appellants that the former POA attorney (whom the Chief believed had unreasonably interfered with the Department's investigation of a prior incident) was no longer employed by the POA. Respondents further represented that its present legal counsel was willing to abide by any reasonable restrictions in the practice which would facilitate the Department's investigation of such incidents. No further meetings were held between the parties.

Thereafter, respondent officers Ferrill, Brewer and Munoz were involved in an on-duty shooting incident and were denied access to a POA represen-

tative or legal counsel prior to the filing of official reports. The POA and the respondent officers then filed this action seeking injunctive relief.

A hearing was conducted on respondents' application for preliminary injunction and the trial court granted a preliminary injunction enjoining appellants from prohibiting the practice;[1] this injunction was subsequently modified.

When the matter came on for trial, appellants renewed their motion to dissolve the injunction. The trial court conducted a hearing to determine whether respondents had failed to exhaust any available administrative remedies. The trial court found that the complaint was not barred by respondents' failure to exhaust administrative remedies, because the MOU specifically excluded past practices from matters subject to grievance procedures.

Respondents presented the testimony of 15 officers and the POA's former legal counsel. These witnesses testified about the existence of the practice, their requests for consultation after such prior incidents, and management's knowledge and tacit approval of such practice. Appellants offered the conflicting testimony of the Chief, two former chiefs, and four officers that management never knew of or approved of the practice.

The court permitted the respondents to file a third amended complaint which alleged a new cause of action seeking a writ of mandate. At the conclusion of the trial, the court issued a notice of intended decision and upon request of appellants, made a formal statement of decision detailing its findings of fact and conclusions of law.

Subsequently, the trial court issued a judgment granting a writ of mandate. The City filed a timely appeal from this judgment.

### APPELLANTS' CONTENTIONS ON APPEAL

Appellants' contentions on appeal may be summarized as follows:

1. The trial court's findings of fact contained in its statement of decision are not supported by substantial evidence;

---

[1]Appellants also appeal from the trial court's grant of the preliminary injunction which preceded the trial on respondents' petition for writ of mandate. Since the appeal from the judgment granting the writ of mandate resolves all questions concerning the preliminary injunction, the preliminary injunction is moot.

2. The POA failed to exhaust its administrative remedies pursuant to the grievance procedure set forth in the MOU;

3. The trial court erred in concluding as a matter of law that the past practice was a "working condition" as opposed to a right reserved to management under the MOU; if the past practice did exist, it was in violation of public policy and should be abolished.

DISCUSSION

I

*The Trial Court's Findings Are Supported by Substantial Evidence*

In *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], our Supreme Court stated, "[i]n resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*' (6 Witkin, Cal. Procedure [2d ed. 1971] § 249, at p. 4241.) All conflicts, therefore, must be resolved in favor of the respondent. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)" (Italics in original.)

"*Where the evidence is in conflict, the appellate court will not disturb the verdict of the jury or the findings of the trial court.* The presumption being in favor of the judgment . . ., the court must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment." (6 Witkin, Cal. Procedure (2d ed. 1971) § 245, p. 4236.) (Italics in original.)

Appellants object to all but two of the trial court's findings of fact and conclusions of law set forth in the statement of decision. However, appellants fail to present any argument or evidence to support their contention that these findings are not supported by the evidence or that the conclusions of law are not supported by the findings.

The crucial findings of fact relate to the existence of the practice of allowing the Department's officers who became involved in shooting incidents

to consult with a POA representative or an attorney prior to the filing of an official report. Respondents presented the testimony of some 15 officers who gave details of the practice, their utilization of the practice in prior incidents, and the fact that they had never been disallowed such a consultation. The appellants presented conflicting testimony from the present Chief, two former Chiefs, and other officers who denied the existence of such practice and/or the Department's management approval of such practice. After consideration of the evidence, the trial court concluded that the practice had in fact existed with the approval of the Department's management. The trial court was well within its prerogative to resolve the conflict in the evidence by accepting the respondents' version of the evidence and rejecting appellants' version.

Appellants' contention that the evidence does not support the findings is without merit. Their failure to articulate any argument in support of this contention reveals the weakness of their position.

II

*Since the MOU's Grievance Procedure Specifically Exempts Consistently Applied Past Practices, There Was No Administrative Remedy for Respondents to Pursue*

The trial court's findings numbers 3 and 4 state that respondents filed an informal grievance, that appellants[2] did not carry through with the grievance procedure and that there was no administrative remedy for respondents to exhaust since the practice was excluded from the definition of a grievance under article Six of the MOU.

Section I of article Six is entitled, "Grievance Procedure." That section states in pertinent part: "It is hereby agreed and understood that the following procedure shall be utilized by the [POA, City], and any officers who are represented by the POA as the method by which applicable disputes are resolved. [¶] DEFINITIONS [¶] 1. A grievance is a complaint by one or more employees concerning the application or interpretation of ordinances, rules, policies, practices, or procedures affecting employees. [¶] 2. *Disputes over proposed modification of or adoption of . . . practices,* procedures or the terms of any proposed collective bargaining agreement, or memorandum of understanding between the City and POA, *are excluded from this procedure.*" (Italics added.)

---

[2]Appellants mistakenly state in their brief that the trial court found that "plaintiffs [meaning respondents] did not follow the grievance procedure." The finding is that it was *appellants'* failure, not respondents'.

Based upon the evidence presented, the trial court found that the practice of allowing officers to consult with a POA representative or attorney after an officer-related shooting was a "consistently applied past practice" within the meaning of article Four, section I, *ante,* at pp. 998-999.

In our view, the trial court was correct in concluding as a matter of law that the term "consistently applied past practices" mentioned in section I, article Four, was exempt from the grievance procedures set forth in section I, article Six. The trial court correctly concluded that the subject matter of this past practice was exempt from the grievance procedure and that the respondents had no administrative remedies to exhaust under the MOU.

## III

█ *The Past Practice Was a Working Condition and Not a Right Reserved to Management Under the MOU*

### A. *The Practice Was a Working Condition*

Appellants contend that even if the past practice did in fact exist, it was not a "working condition" within the meaning of article Four, section I, of the MOU. Rather, appellants contend that this past practice is a matter reserved to management under article Two of the MOU.[3]

We have carefully considered the items of section I, article Two, and find no basis for interpreting any of the listed 20 items as concerning the ques-

---

[3]Section I, article Two, reserves to the City matters which relate solely and exclusively to management, except those specifically vested to the POA by the MOU. This section then enumerates 20 items which are among the items reserved to management, including the following: "1. To manage the Police Department and determine policies and procedures and the right to manage the affairs of the Department. . . . [¶] 4. To direct, supervise, recruit, select, hire, evalute [*sic*], promote, transfer, discipline, discharge, terminate, demote, reduce, suspend, reprimand, withhold salary increases and benefits for disciplinary reasons, or otherwise discipline employees in accordance with City, Department, and/or Civil Service Rules and Regulations. . . . [¶] 12. To establish and modify goals and objectives related to productivity and performance programs and standards, including but not limited to quality and quantity, and require compliance therewith. . . . [¶] 14. To determine the issues of public policy and the overall goals and objectives of the Police Department and to take necessary action to achieve the goals and objectives of the Police Department. . . . [¶] 17. To establish, implement, and/or modify rules and regulations, policies and procedures related to productivity, performance, efficiency, personal appearance standards, code of ethics and conduct, safety and order, and to require compliance therewith. [¶] 18. To maintain order and efficiency in police facilities and operation. [¶] 19. To restrict the activity of an employee organization on City facilities and on City time except as set forth in this agreement. [¶] 20. To take any and all necessary steps and actions to carry out the service requirements and mission of the City in emergencies or any other time deemed necessary by the City and not specified above."

tioned past practice. Indeed, appellants' opening brief lists 11 of these items but fails to demonstrate how any of such items could be construed to include the questioned practice.

Article Four, section I, provides that if the past practice is a working condition, it could not be reduced unless and until the parties agreed to such reduction in writing. This section also requires compliance with the "meet and confer in good faith" procedure set forth in Government Code section 3505,[4] before any rule, regulation or policy affecting wages, hours, or terms or conditions of employment is amended.

If the past practice was a matter reserved to management, the appellants could change such practice without a prior written agreement or complying with the meet and confer procedures.

Thus, it is critical to our decision to determine whether the trial court was correct in determining the practice to be a working condition[5] and not a matter reserved to management.

Appellants utilize the language in section 3504 in arguing that the practice is a matter reserved to management and not a working condition. Section 3504 defines the scope of representation of a recognized employee organization to "include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, *except, however, that the scope*

---

[4]Government Code section 3505 provides, "[t]he governing body of a public agency, . . . shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations, . . . and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action. [¶] 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent."
All further references shall be to the Government Code unless otherwise specified.

[5]Article Eight of the MOU is entitled "Working Conditions" and sets forth the existing working conditions of the Department as of the effective date of the MOU. This article specifies matters concerning two-man units, vacation and holiday scheduling, exchange of days off, addressing squad meetings, release time, certification by the Department of vacant positions, and work assignment policy of officers who are members of the POA board of directors. Article Eight does not mention the questioned past practice and is therefore of no assistance in resolving the dispute herein.

*of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."* (Italics added.)

The thrust of appellants' argument concerning section 3504 is premised on its view of public policy, namely, that the City is charged with the responsibility of providing police services and that such practice prevents the proper delivery of such services because the Department is not allowed timely and unfiltered reports from officers involved in a shooting incident untainted by the possible infusion of advice from an attorney or POA representative, and thus the Department's investigation of the incident is hampered. Appellants argue that the Chief's executive order is directed at abrogating a practice relating to the "merits, necessity or organization of any service or activity" of the Department.

We have considered appellants' contentions concerning public policy below and reject them. Our rejection of these contentions leads us to reject appellants' interpretation of section 3504.

B. *Public Policy Considerations*

In *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507], a union of city firefighters won a writ of mandate directing the city to proceed to arbitration on four matters relating to reduction of personnel, vacancies, demotions, scheduling of hours, and constant manning procedures. The Vallejo city charter granted the city's employees the right to bargain on "wages, hours, and working conditions," but not as to matters involving the "merits, necessity or organization of any governmental service." During negotiations between the city and the union as to the terms of a new contract, the parties failed to agree on 28 matters. Pursuant to the city charter, the parties submitted the disputed matters to mediation and factfinding. When these procedures failed to resolve the dispute, the city agreed to submit 24 of the matters to arbitration but contended that the other 4 matters mentioned above were not subject to arbitration because they involved the "merits, necessity or organization" of the fire-fighting service and were not arbitrable.

In *Fire Fighters,* our Supreme Court modified the judgment and remanded the matter to the superior court with directions to issue a writ of mandamus requiring the city to arbitrate these four items. In so holding, the court discussed the specific problem of reconciling the seemingly two vague overlapping phrases of section 3504, stating, " 'wages, hours and working conditions,' which, broadly read could encompass practically any conceivable

bargaining proposal; and 'merits, necessity or organization of any service' which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion. [¶] In attempting to reconcile these provisions, we note that the phrase 'wages, hours and other terms and conditions of employment' in the MMBA was taken directly from the National Labor Relations Act [fn. omitted] (hereinafter NLRA). . . . A whole body of federal law has developed over a period of several decades interpreting the meaning of the federal act's 'wages, hours and other terms and conditions of employment.' [¶] In the past we have frequently referred to such federal precedent in interpreting parallel language in state labor legislation. . . . [¶] The origin and meaning of the second phrase—excepting 'merits, necessity or organization' from the scope of bargaining—cannot claim so rich a background. *Apparently the Legislature included the limiting language not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions.*

"Although the NLRA does not contain specific wording comparable to the 'merits, necessity or organization' terminology in the city charter and the state act, the underlying fear that generated this language—that is, that wages, hours and working conditions could be expanded beyond reasonable boundaries to deprive an employer of his legitimate management prerogatives—lies imbedded in the federal precedents under the NLRA. As a review of federal case law in this field demonstrates, the trepidation that the union would extend its province into matters that should properly remain in the hands of employers has been incorporated into the interpretation of the scope of 'wages, hours and terms and conditions of employment.' [Fn. omitted.] Thus, because the federal decisions effectively reflect the same interests as those that prompted the inclusion of the 'merits, necessity or organization' bargaining limitation in the charter provision and state act, the federal precedents provide reliable if analogous authority on the issue." (*Fire Fighters, supra,* 12 Cal.3d at pp. 615-617.) (Italics added.)

In discussing whether the question of the level of manpower in the fire department was definitely a matter of fire prevention policy and thus not within the scope of representation under the Meyers-Mileas-Brown Act (MMBA), the *Fire Fighters* court pointed out that under federal decisions, the questions of employee workload and safety are recognized as mandatory subjects of bargaining. (*Fire Fighters, supra,* 12 Cal.3d at pp. 619-620.) Our Supreme Court disposed of this issue by sending the matter back for arbitration to decide "whether the manpower issue *primarily* involves the

workload and safety of the men ('wages, hours and working conditions') or the policy of fire prevention of the city ('merits, necessity or organization of any governmental service')." (*Id.,* at pp. 620-621.)

Counsel has failed to provide us with any cases arising under the NLRB (National Labor Relations Board) which are on point with the questioned practice and our own research has failed to reveal any similar federal precedent with the exception of the Ninth Circuit's decision in *Portland Police Ass'n.* v. *City of Portland* (9th Cir. 1981) 658 F.2d 1272.

In *Portland,* the police association brought suit for injunction against enforcement of an order by the police chief of Portland requiring officers to prepare reports after "major incidents" and providing that officers did not have the right to consult with an attorney, but providing for counsel if superiors believed that an officer might be exposed to criminal liability or employment sanctions. The district court denied the association's request for an injunction. The association appealed to the Ninth Circuit. The majority held that the association's action did not present a judiciable controversy because the parties' pretrial statement agreed that no Portland police officer had ever been denied counsel.

Judge Reinhardt's dissenting opinion in *Portland* disagreed with the majority's holding that the action was nonjusticiable. The dissent concluded that there was no question that the officers who consulted with an attorney in violation of the chief's memorandum order were subject to discipline, including discharge, and therefore took issue with the majority's conclusion as to the "speculative" nature of the association's action. Footnote 2 of the dissent states, "[t]he constitutional problem is most squarely presented when a police officer wishes to consult a private attorney in order to obtain advice as to his obligation to prepare and submit the report, the consequences of his failure to do so, and the uses to which such a report may be put. He may also want to know the extent of his obligation to talk with his commanding officer or the Bureau's legal advisor, and whether he is entitled to have a representative of the Association, a fellow police officer, present. The answer to these questions may be obvious to some persons, but not necessarily to all police officers. The exception, certainly, is of no assistance to the officer seeking to obtain this information *before* he meets with his commanding officer or the Bureau's legal advisor." (*Id.,* at p. 1275, fn. 2.) (Italics in original.) Unlike the situation in *Portland,* the instant matter is indeed justiciable. The respondent officers were involved in a shooting incident and were denied their request to consult with a POA representative or an attorney.

Because of the absence of any federal precedents which would assist us in this matter, we must turn to California decisions in somewhat similar situations.

In *Long Beach Police Officers Assn.* v. *City of Long Beach* (1976) 61 Cal.App.3d 364 [132 Cal.Rptr. 348], the POA brought an action against the City for declaratory and injunctive relief to restrain enforcement of a provision in the police manual governing and restricting the display and discharge of firearms by peace officers. The action sought a declaration that the provision denied the officers due process and equal protection of the law and were inconsistent with and preempted by state law. The action was *not* brought pursuant to the MMBA. The court concluded at page 371, "[t]he formulation of a policy governing use of deadly force by police officers is a heavy responsibility involving the delicate balancing of different interests: the protection of society from criminals, the protection of police officers' safety, and the preservation of all human life if possible. This delicate judgment is best exercised by the appropriate legislative and executive officers. The effort of the appropriate officials of the City of Long Beach to make that determination in the interests of its citizens and its police officers should be upheld if it is consistent with state law and constitutional standards."

In *San Jose Peace Officer's Assn.* v. *City of San Jose* (1978) 78 Cal.App.3d 935 [144 Cal.Rptr. 638], the trial court granted judgment to a police officer's association declaring that the city must meet and confer with the association pursuant to the MMBA before changing a portion of the city's use of force policy governing when a police officer may discharge his firearm. The city and the association had entered into a memorandum of understanding pursuant to the MMBA and during the period the understanding was in force, the chief of police issued a new policy governing the use of firearms without meeting and conferring with the association. The Court of Appeal reversed, holding that the conditions under which a police officer may kill are not matters within the scope of representation as defined in section 3505 requiring a public employer to meet and confer in good faith.

*San Jose* mentioned a test which has been applied in cases arising under the NLRB by the Court of Appeal for the Ninth Circuit and other circuits. The *San Jose* court quoted from *Westinghouse Electric Corporation* v. *N. L. R. B.* (4th Cir. 1967) 387 F.2d 542, 548, wherein the Fourth Circuit said: " 'In the instant case we arrive at the conclusion, one which we believe is not inconsistent with past pronouncements of this court, that since practically every managerial decision has some impact on wages, hours, or other conditions of employment, the determination of which decisions are mandatory bargaining subjects must depend upon whether a given subject has a

*significant or material relationship* to wages, hours, or other conditions of employment.' (Italics supplied; [citations].)" (*San Jose, supra,* 78 Cal.App.3d at p. 945.) *Westinghouse* has been relied on by other circuits, including the Ninth Circuit. The *San Jose* court then concluded, "[r]equiring that the decision have a 'significant or material' relationship to working conditions (*Westinghouse, supra*) is substantially the same as requiring that the decision 'primarily' involve working conditions. (*Fire Fighters, supra.*) This is also consistent with Mr. Justice Stewart's [concurring] opinion in *Fibreboard Corp.* [v. *Labor Board* (1964) 379 U.S. 203, 223 (13 L.Ed.2d 233, 245, 85 S.Ct. 398, 6 A.L.R.3d 1130)], that decisions 'which impinge only indirectly' upon a subject of bargaining are not the subject of collective bargaining." (*San Jose, supra,* 78 Cal.App.3d at p. 945.)

The *San Jose* court then stated, "[w]hile private managerial concepts do not translate easily to the public sector, we can imagine few decisions more 'managerial' in nature than the one which involves the conditions under which an entity of the state will permit a human life to be taken. . . . Unlike the normal job in the private sector, or indeed, the job of a fire fighter, police work presents danger from third parties, rather than from dangerous working conditions. Thus the employer cannot eliminate safety problems merely by purchasing better equipment or by increasing the work force, as in *Fire Fighters.* The danger posed to a police officer by a suspected criminal must be balanced against difficult considerations of when an escaping criminal should pay the price of death for ignoring a peace officer's command to stop. Viewed in this context, the safety of the policeman, as important as it is, is so inextricably interwoven with important policy considerations relating to basic concepts of the entire system of criminal justice that we cannot say that the use of force policy concerns 'primarily' a matter of wages, hours or working conditions. . . . Such an effect on public safety lends further support to our conclusion that the use of force policy is primarily a matter of public safety and therefore not a subject of meeting and conferring under the MMBA. While the policy may impinge on a condition of employment, it impinges only indirectly." (*Id.,* at pp. 946-947.)

In our view, the use of force policy discussed in *San Jose* and *Long Beach* is distinguishable. A use of force policy concerning police officers is appropriately within the scope of managerial decision rather than a matter subject to collective bargaining. The purpose of a use of force is to establish through the appropriate legislative process parameters upon which a police officer should use his weapon. While the establishment of the policy may "impinge" upon the working conditions of police officers, it is directed at pre-

vention of the unnecessary use of force which may result in great bodily injury or death.

On the other hand, the practice in question is directed at an act of force which has already occurred. The difference in timing of the act of force is crucial. Public safety is no longer directly at issue after an incident has occurred. The main thrust of appellants' contention is that the Department and the public have the right to know the true circumstances of the incident without the possible taint from the advice of others. The public policy question is whether the officers' rights are superior to the right of the Department and the public to know the so-called "true" circumstances of the incident.

When an officer uses his weapon, the circumstances are normally serious and life-threatening. The focus is clearly and directly upon the officer and the other participants of the incident. While the public concern for a timely revelation of facts in these circumstances is extremely important, it does not outweigh the contractual right of the officer to consult with an advisor prior to the preparation of a report, especially when the report could be incriminating and the decision to seek punitive or criminal action could in part be based upon such report. The public concern cannot also outweigh the potential violations of the officer's rights under the Fifth and Sixth Amendments.[6] Although appellants correctly urge that the situation is ripe for potential abuse, we cannot presume that abuse will occur.

The Public Safety Officers' Procedure Bill of Rights Act, section 3303, states, "[w]hen any public safety officer is under investigation and subjected to interrogation by his commanding officer, or any other member of the employing public safety department, which could lead to punitive action, such interrogation shall be conducted under the following conditions. . . . [P]unitive action is defined as any action which may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment. . . . [¶] (h) Upon the filing of a formal written statement of charges, or whenever an interrogation focuses on matters which are likely to result in punitive action against any public safety officer, that officer, at his request, shall have the right to be represented by a representative of his choice who may be present at all times during such interrogation. The representative shall not be a person subject to the same investigation. The representative shall not be required to disclose, nor be subject to any punitive action for refusing to disclose, any information re-

---

[6]We recognize that the trial court concluded that "[t]he Constitution does not give [respondents] the right to union representation and/or union legal counsel prior to making statements in oral and written reports in officer related shooting cases." We do not necessarily agree with this conclusion.

ceived from the officer under investigation for noncriminal matters. [¶] This section shall not apply to any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer, nor shall this section apply to an investigation concerned solely and directly with alleged criminal activities."

Section 3303 specifically allows the officer representation if in fact an interrogation is focused on matters which are likely to result in punitive action. Although the trial court specifically found that the respondents were not entitled to relief under section 3303, subdivision (h), because they did not meet their burden of showing that the making of a report in an officer-related shooting is likely to result in punitive action, the failure to meet this burden is not dispositive of the issue of the respondents' contractual rights in this action. It would be absurd if an officer who has committed a minor infraction and who is subject to inconsequential punitive action is entitled to representation and counselling under section 3303, subdivision (h), while an officer who has just been involved in a shooting incident and faces potentially grave penal sanctions is not entitled to an advisor prior to the filing of a potentially incriminating report.

Using the "primary" test espoused in *Fire Fighters, supra,* 12 Cal.3d 608, or the "significant or material relationship" test in *Westinghouse, supra,* 387 F.2d 542, we conclude that the practice is one involving a working condition and not a matter reserved to management under the MOU. This conclusion is consistent with the public policy because it prevents this sensitive practice from being changed without a statutorily mandated meet-and-confer procedure set forth in the MMBA.

An officer involved in a shooting is normally subjected to immediate interrogation by the district attorney's office and the Department's internal affairs representatives. The officer may well have a fear, albeit a phantom fear, that he could be subject to punitive as well as criminal action. The Chief's unilateral decision to abolish the practice, however, prevented a meaningful and possibly amicable solution to this dispute by negotiation.

The POA has represented that its attorneys were willing to abide by any reasonable restrictions in the practice. We accept this representation at face value and conclude that the appellants' unilateral abrogation of the past practice was in violation of the MMBA's meet and confer provisions contained in section 3505.

Because of our resolution of this appeal on the basis of the MOU and the MMBA, it becomes unnecessary for us to decide the issues on the basis of the Fifth and Sixth Amendments of the United States Constitution.

For the foregoing reasons, we affirm the judgment entered below.

Klein, P. J., and Arabian, J., concurred

Appellants' petition for a hearing by the Supreme Court was denied August 23, 1984. Mosk, J., and Lucas, J., were of the opinion that the petition should be granted.